NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

SAMANTHA D., *Appellant,*

v.

DEPARTMENT OF CHILD SAFETY, T.D., A.D., C.W., *Appellees.*

No. 1 CA-JV 17-0534
FILED 5-31-2018

Appeal from the Superior Court in Mohave County
No. S8015JD201600088
The Honorable Douglas Camacho, Commissioner

**AFFIRMED**

COUNSEL

The Stavris Law Firm PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee Department of Child Safety*

Mohave County Legal Advocate, Kingman
By Kathy Tuthill
*Counsel for Appellees T.D., A.D., and C.W.*

---

**MEMORANDUM DECISION**

Judge David D. Weinzweig delivered the decision of the Court, in which Presiding Judge Diane M. Johnsen and Judge Paul J. McMurdie joined.

---

**W E I N Z W E I G**, Judge:

¶1         Samantha D. appeals from the juvenile court's order terminating her parental rights to three biological children.  We affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2         Samantha D. ("Mother") had three children born between 2013 and 2015, C.W., A.D. and T.D., with three different fathers, including Matthew W., C.W.'s biological father ("Father").  Mother, Father and the children lived together in November 2016 inside a recreational vehicle ("RV") parked near the Kingman home of Father's brother.

¶3         On a Sunday evening, the family gathered to eat and watch football at the brother's adjacent home.  Father drank heavily, became ill and returned to the RV to rest.  Mother soon followed with A.D., who was fussing and crying. Mother fed A.D. as Father vomited in the bathroom. She then returned to the house, leaving A.D. with Father in the RV.

¶4         Not more than 30 minutes later, Father yelled for Mother.  He said A.D. needed to go to the hospital because he pulled A.D.'s leg and heard it pop.  Mother took A.D. to the emergency room at Kingman Regional Medical Center.  She left C.W. and T.D. with Father.

¶5         A.D. had fractured his left femur.  His right temple was bruised and lacerated.  He had bruising around the neck, petechia on both eyelids and facial abrasions.   Hospital staff asked Mother what happened. Mother lied.  She said A.D. was standing on a chair when he fell and caught his leg in the chair.  She attributed the bruising and facial abrasions to other recent events, including that A.D. had fallen down the stairs and been involved in an off-road-vehicle accident.

¶6         Child abuse was suspected.  Nurses contacted the sheriff's office and Department of Child Safety ("DCS").  A.D. was transferred that night by ambulance to a second hospital and emergency room, Sunrise Children's Hospital.  Mother accompanied him.  She repeated her story to

hospital staff, saying A.D. injured his leg when he fell from a chair and other recent adventures caused his bruises and facial abrasions.

¶7            A.D.'s treating physician doubted Mother's account.   He noted that "[t]he patient's mechanism for injury is not consistent with his fracture" and referred A.D. to the hospital's child protection team for suspected non-accidental trauma.  A second physician later repositioned A.D.'s bone and placed him in "a long splint from the pelvis down to the ankle."

¶8            The next day, DCS took temporary custody of C.W. and T.D. and filed a petition alleging they were dependent as to Mother.  DCS claimed Mother had neglected them "due to [an] unfit home" and failed to protect their brother, A.D., from physical abuse.

¶9            Mother and Father provided different stories to law enforcement and DCS.  Father initially denied causing A.D.'s injuries, but later admitted he had "become frustrated and annoyed" because A.D. "would not stay on the bed."  He shook A.D., grabbed his left arm and leg, "forcefully threw him onto the bed" and "heard [a] leg pop."  He conceded that Mother had "chang[ed] the story to make it sound like [A.D.] fell [off a] chair," but confessed that he injured A.D. "out of frustration."  And he admitted to "drinking heavily."  Police arrested Father and charged him with aggravated assault and child abuse.  Father later pled guilty to child abuse.

¶10           A pair of DCS investigators inspected the RV.  The first characterized the living conditions as "cause for removal" alone.  The second cataloged the dangerous and unsanitary conditions, both inside and outside the RV.  She encountered a foul odor, piles of rotten trash and debris outside the RV, along with chemical containers and dangerous tools.  She described how flies swarmed from the RV when she opened the door to enter and how an "overwhelming smell of fecal matter" pervaded the cabin.  The "toilet was full of feces and urine."  She found used diapers next to food items, "soiled blankets" in the playpen, piles of dirty dishes and "wires everywhere."  She observed clothes, trash, rotting food and debris strewn about the trailer.  The children all slept on a piece of foam on the floor.  Mother later conceded the RV was "not really" safe for the children.

¶11           DCS seized temporary custody of A.D. upon his release from the hospital and placed him in foster care with his siblings, T.D. and C.W.  DCS filed a supplemental petition alleging A.D. was similarly dependent as to Mother based on abuse and neglect.  The juvenile court adjudicated

the children dependent and approved concurrent case plans of family reunification and severance and adoption.

¶12        DCS formulated a case plan for Mother and referred her for substance-abuse treatment, random drug testing, behavioral health services, a psychological evaluation and parenting classes. Mother accepted treatment and services for a few months, but her participation was sporadic. In addition, DCS arranged supervised visits between Mother and children, which went well and the children were happy to see Mother.

¶13        Mother frequently stumbled in the months after removal. She tested positive for marijuana and alcohol. She could not maintain stable employment and housing. DCS learned Mother was dating a felon who'd been convicted of aggravated assault, although Mother said they were just friends. Mother was arrested for possession of methamphetamine and drug paraphernalia. She pled guilty. The court entered a deferred entry of guilt and placed her on probation for one year.

¶14        Meanwhile, the children thrived in foster care. Their foster placement met their basic needs and ensured that A.D. received the care he needed to recover from his injuries.

¶15        Against that backdrop, DCS determined it had sufficient grounds to move for severance based on abuse and neglect under A.R.S. § 8-533(B)(2) and filed a motion to terminate Mother's parental rights to the children in January 2017. Mother denied the allegations and requested a severance trial.

¶16        The court heard two days of evidence and argument. Mother was present, represented by counsel and testified on her own behalf. The court ultimately terminated Mother's parental rights to A.D., C.W. and T.D. based on neglect, but did not find clear and convincing evidence of willful abuse.[1] Mother timely appealed. We have jurisdiction pursuant to Ariz. Const. art. VI, § 9 and A.R.S. § 8-235(A).

---

[1]        The written order was inconsistent with the findings the court made at the conclusion of the trial; it inadvertently listed abuse as a second ground for terminating Mother's parental rights. We need not consider the issue of willful abuse, however, because reasonable evidence supports the severance based on neglect. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).

**DISCUSSION**

**A.    General Principles.**

**¶17**        Mother has a fundamental but not absolute right to custody of her children. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). To sever the parent-child relationship, the juvenile court must find clear and convincing evidence of at least one statutory ground in A.R.S. § 8-533(B) and find that termination is in the child's best interests by a preponderance of the evidence. *Id.* at 249, ¶ 12; *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005). We will affirm a severance order unless it is clearly erroneous. *Jesus M.*, 203 Ariz. at 280, ¶ 4. We accept the court's findings of fact unless no reasonable evidence supports them, *id.*, and view the evidence in the light most favorable to upholding the order. *Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, 97, ¶ 20 (App. 2009).

**B.    Neglect.**

**¶18**        Mother argues the juvenile court had insufficient evidence to terminate her parental rights based on neglect. Parental rights may be terminated when there is clear and convincing evidence that "the parent has neglected or willfully abused a child." A.R.S. § 8-533(B)(2). Neglect includes "the inability or unwillingness of a parent . . . to provide [the] child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare." A.R.S. § 8-201(25)(a).

**¶19**        The juvenile court was presented with substantial evidence to find neglect. The court heard considerable evidence and testimony that the children lived in foul and hazardous conditions at the time of removal, both inside the RV and outside. The court found "[t]he home was completely unsanitary, with trash and debris blocking the entrance and exit. There was trash and hazardous items throughout the inside and outside of the home, [including] rotting food, sharp objects and tools within reach of the children. The home poses a significant risk to the well-being of the children."

**¶20**        The court found more support from the uncontested events leading to A.D.'s injury. Mother left A.D. alone with Father despite knowing Father had consumed a significant amount of alcohol, was "already upset from an earlier argument" and was "frustrated due to the children being too loud." Father broke A.D.'s femur and bruised his neck. And yet, later that same night, Mother left T.D. and C.W. alone with Father.

¶21 Mother also misled the hospital staff and law enforcement about the genesis of A.D.'s injuries in order to protect Father. In doing so, she firmly placed Father's interests above A.D.'s well-being. Even after months of services, she never accepted responsibility for A.D.'s injuries or the severity of her decision to leave the children with an inappropriate caregiver.

¶22 We are not persuaded by Mother's arguments. She argues "the inside of her residence was cleanly [sic]," but substantial evidence was presented to the contrary. *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 287, ¶ 16 (App. 2016) ("[T]he resolution of conflicts in the evidence is uniquely the province of the juvenile court, and we will not reweigh the evidence in our review."). She also claims to have secured a new residence with a man named "Michael" and his roommate. She says Michael is financially supporting her and will support her three children if returned to her care. But the evidence demonstrates that Mother has lived a transitory existence. She moved at least five times in less than 18 months. Michael never testified. And she provided the court with no reason for his altruism; indeed, she denied even dating him. Even assuming Mother's current situation is different, Michael has no legal obligation to financially support her and her children. And she offered no evidence that, if the relationship dissolves, she would have means to care for her children by herself. The court did not err by terminating Mother's parental rights based on neglect.

## C.     Best Interests.

¶23 Mother likewise disputes that termination was in the children's best interests under a preponderance of the evidence. Severance of the parent-child relationship is in a child's best interest if the child would benefit from termination of the parental relationship or would be harmed by continuing the relationship. *James S. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 351, 356, ¶ 18 (App. 1998). The court may consider whether the child is adoptable, an adoptive placement is immediately available and the existing placement is meeting the child's needs. *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 379, ¶ 30 (App. 2010).

¶24 The record contains substantial evidence to support the juvenile court's best-interests finding. The court heard testimony from three DCS officials that termination of Mother's parental rights was in the children's best interest because it provided an opportunity for them to be adopted by someone willing and able to protect them. One official testified that the children were adoptable, the current placement was meeting their

needs and DCS had identified a possible adoption placement for all three children.

¶25 The record also indicates that maintaining the parent-child relationship would be detrimental to the children while termination of parental rights would benefit the children by freeing them from a neglectful parent. Mother's post-removal circumstances and conduct are instructive. She tested positive for marijuana and alcohol, failed to maintain stable employment and housing, cohabitated with a convicted felon and pled guilty to possessing methamphetamines and drug paraphernalia. She often misled DCS about her current living conditions. And at the severance trial, Mother said she was unemployed.

¶26 We reject Mother's arguments that termination is not in the best interests of her children because "she loves her children" and "the children are happy to see their Mother." The court expressed skepticism that a three-year-old and four-year-old would understand "everything that [was] going on." And the juvenile court was in the best position, as the trier of fact, to weigh the evidence, assess the credibility of witnesses and resolve any conflicts in the evidence. Because reasonable evidence supports the court's findings and conclusions, we do not disturb them. *Jennifer S.*, 240 Ariz. at 287, ¶ 16. The juvenile court did not err in its best-interests finding.

## CONCLUSION

¶27 The juvenile court properly terminated Mother's parental rights to her three children based on neglect. We affirm.

