995 P.2d 682

**MICHAEL J., Appellant,**

v.

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY and Zachariah J., Appellees.**

**No. CV–99–0129–PR.**

Supreme Court of Arizona, En Banc.

March 30, 2000.

Gary Sheets, Phoenix, Attorney for Michael J.

Janet Napolitano, The Attorney General by Kathleen P. Sweeney, Assistant Attorney General and Susan J. Gebhard, Assistant Attorney General, Phoenix, Attorneys for the Arizona Department of Economic Security

Michael D. Hintze & Assoc., Ltd. by Michael D. Hintze and Kevin W. Holliday and Richard D. Dault, Phoenix, Attorneys for Zachariah J.

Mary L. Verdier, Phoenix, Attorney for Amicus Curiae Adoptive Parent.

## OPINION

McGREGOR, Justice.

### I.

¶ 1 This case requires that we again consider the bases for severing parental rights and the test to apply to determine whether a sufficient basis exists. In January 1997, the Arizona Department of Economic Security (the ADES) filed a severance action on behalf of Zachariah J. The superior court terminated the father's rights based on three grounds: (1) length of the father's felony sentence, (2) unfit parent, *see* Arizona Revised Statute Annotated (A.R.S.) § 8–533.B.4 (West 1999), and (3) abandonment, *see* A.R.S. §§ 8–531.1 & 8–533.B.1 (West 1999). The court of appeals reversed.

¶ 2 We granted the petition for review filed by the ADES to resolve recurring issues in this critical area of family law. We have jurisdiction pursuant to the Arizona Constitution, article VI, section 5.3, A.R.S. section 12–120.24 (West 1992), and Rules of Procedure of Juvenile Court 28(a) (West Supp.1999). We now vacate the opinion of the court of appeals and affirm in part and reverse in part the judgment of the superior court.

### II.

¶ 3 The child, Zachariah, was born on December 25, 1995. The ADES took custody of Zachariah the day after his birth because he had been exposed to amphetamines by his mother. His father, Michael J., was absent because one month earlier he had been sentenced to a 3.5 year prison term for aggravated assault and misconduct involving a weapon.

¶ 4 In January 1996, the ADES served Michael, in prison, with a dependency petition. Michael did not answer and did not participate in the January 23, 1996 dependency hearing, at which Zachariah was declared dependent. On January 30, the ADES sent Michael a letter notifying him that Zachariah was in its custody. On February 23, Michael wrote the following letter to the ADES:

> I am writing this to you in regards to my son Zachariah.
>
> I have been told I needed to contact you & let you know what my plans are in regards to him. First let me say I would very much like to see him. Also let me say that I am his father & he is my son and I plan on being his father & raising him when I get out. In fact I would like, and plan on, myself, my wife Leah, and all of our children being a normal functioning family upon my release. Until my release I would like to at least be able to have visits with him.
>
> If there is anything else I can do please contact me.

¶ 5 In March 1996, the ADES responded to Michael's request to let him know what else he could do as follows:

> Your letter was received requesting a visit with Zachariah.... You have not been in contact with the court and in your best interest you need to write to the court

and request an Attorney who can help with possible visitation. The address of the court is Superior Court of Arizona, Juvenile Division, 3215 W. Durango, Phoenix, AZ 85009. Request an Attorney in writing.

This case has been set for severance which means that a court hearing will be set to sever all parental rights due to the fact that you are in prison and unable to parent and Leah will have a severance hearing due to other reasons. Zachariah has already been found a Ward of the State in regards to you because you did not contact the court after you were served. In order to protect any of your rights, you need to write the Juvenile Court.[1]

¶ 6 Despite the advice given by the ADES, Michael neither wrote to the superior court nor contacted the ADES again for more than a year. During that time, he never inquired about Zachariah's welfare, requested services, or provided any financial support for Zachariah. He did not ask for an attorney or visitation.

¶ 7 In January 1997, the ADES filed a petition to terminate Michael's parental rights. That filing prompted a response from Michael's lawyer, who wrote to the ADES in April 1997. By the time of the severance hearing in December 1997, approximately one year remained on Michael's sentence. At the hearing, Michael testified that he had not used drugs in the past three years, that he had taken parenting and anger management classes in prison, that he wanted to parent Zachariah when he was released, and that his mother would help care for the child.

¶ 8 An ADES case manager testified that Michael had never seen Zachariah, written him any letters, or sent him any gifts. During the one and one-half years prior to the hearing, then two-year-old Zachariah had been living with his mother's cousin, who loved him, had bonded with him, and had

taken steps to become certified to adopt him. The case manager testified that severance was in Zachariah's best interests because he was well-adjusted and happy in his placement, permanency is important for children, and the cousin with whom he lived loved him and could provide him a decent future.

¶ 9 Judge Hertzberg found three grounds for severance by clear and convincing evidence: (1) the length of Michael's sentence would deprive Zachariah of a normal home life for a period of years, (2) Michael was an unfit parent due to the nature of his crimes, and (3) Michael had abandoned Zachariah because he had failed to maintain a normal parental relationship.

¶ 10 The court of appeals reversed on all three grounds, holding that the superior court erred because its "findings were not supported by clear and convincing evidence." *Michael J. v. Arizona Dep't of Econ. Sec.*, 194 Ariz. 231, 232, 979 P.2d 1024, 1025 (App. 1999).

### III.

¶ 11 Severance of parental rights necessarily involves the consideration of fundamental, often competing, interests of parent and child. "This court and the United States Supreme Court have long recognized that the right to the control and custody of one's children is a fundamental one." *In re Maricopa County Juvenile Action No. JS-500274*, 167 Ariz. 1, 4, 804 P.2d 730, 733 (1990) (*Action No. JS-500274*). "[T]his fundamental right 'does not evaporate simply because' the natural parents 'have not been model parents or have lost temporary custody of their child to the state.'" *Id.* (quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982)).

¶ 12 The right of a parent to custody of his child, however, is not absolute. The State can terminate parental rights under specified circumstances and procedures. In Arizona, "[t]ermination of parental rights is

---

1. The court of appeals characterized this exchange of letters as Michael's request for visitation and an ADES response that "denied [the request] without explanation." *Michael J. v. Arizona Dep't of Econ. Sec.*, 194 Ariz. 231, 235, 979

P.2d 1024, 1028 (App.1999). We understand the ADES letter as a forthright explanation of the steps Michael should take to preserve his parental rights.

governed solely by A.R.S. § 8–533." *In re Pima County Juvenile Severance Action No. S–114487*, 179 Ariz. 86, 95, 876 P.2d 1121, 1130 (1994) (*Action No. S–114487*). To justify termination of the parent-child relationship, the trial court must find, by clear and convincing evidence, at least one of the statutory grounds set out in section 8–533, and also that termination is in the best interest of the child. *See* A.R.S. § 8–533.B.

¶ 13 The superior court found three statutory grounds for severing Michael's parental interest and also found that severance would be in Zachariah's best interest. Michael has never challenged the superior court's best interest finding. We therefore accept that finding and do not address it further.

**A.**

¶ 14 The court of appeals held that the superior court clearly erred in finding that Michael had abandoned Zachariah under A.R.S. section 8–533.B.1. We disagree.

¶ 15 The standard for determining whether a parent has abandoned his child has been the subject of some confusion. "Until 1982, the termination statute contained its own definition of abandonment. When that was deleted, our courts seemingly set off on their own, generally ignoring the definition in § 8–546," which has now been renumbered to 8–531. *Action No. S–114487*, 179 Ariz. at 95 n. 11, 876 P.2d at 1130 n. 11. Two common law tests developed to define what constitutes abandonment: the settled purpose doctrine and the conscious disregard test.[2]

¶ 16 We took the first step toward eliminating confusion in this area in *Action No. S–114487*, in which we terminated an unwed father's parental rights because he had abandoned his child. We rejected both common law tests in favor of the statutory definition of abandonment because "adhering to settled

purpose or conscious disregard concepts in these cases in which no such relationship exists defeats the essential goal: prompt finality that protects the child's interests." *Id.* at 97, 876 P.2d at 1132. We noted that prompt finality is paramount because "[o]therwise a young child languishes in limbo—surrendered by the mother, unclaimed by the father, and bonding with others—from which the law cannot extricate the child without lengthy proceedings compounding the harm." *Id.*

¶ 17 The statute that applied in *Action No. S–114487*, A.R.S. § 8–546.A.1, defined abandonment "as the 'failure ... to provide reasonable support and to maintain regular contact ..., including ... normal supervision, *when such failure is accompanied by an intention on the part of the parent* to permit such condition to continue for an indefinite period in the future.'" *Id.* at 96, 876 P.2d at 1131 (emphasis added). In 1994, the legislature deleted the intent language from the statute. "Abandonment" now means

> the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a *normal* parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

A.R.S. § 8–531.1.

¶ 18 Under the revised statute, abandonment is measured not by a parent's subjective intent, but by the parent's conduct: the statute asks whether a parent has provided reasonable support, maintained regular contact, made more than minimal efforts to support and communicate with the child, and

---

**2.** The settled purpose doctrine focuses on parental intent and has been defined as "clear and convincing evidence of intentional conduct on the part of a parent that evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child." *In re Maricopa County Juvenile Action No. JS–500274*, 167 Ariz. 1, 4, 804 P.2d 730, 733 (1990). The conscious disregard test looks at "conduct on the part of the parent which implies a conscious disregard

of the obligations owed by a parent to his child, leading to the destruction of the parent-child relationship." *In re Pima County Juvenile Action No. S–1182*, 136 Ariz. 432, 433, 666 P.2d 532, 533 (App.1983). For a further explanation of the two tests and their application, see *In re Pima County Juvenile Severance Action No. S–114487*, 179 Ariz. 86, 95–97, 876 P.2d 1121, 1130–32 (1994).

maintained a normal parental relationship. Referring to this amended statute in *Action No. S–114487*, we expressly noted that our decision to consider a parent's conduct rather than his subjective intent fully accorded with the legislature's decision to delete the intent language in the definition of abandonment in favor of a focus on conduct. *Id.* at 97 n. 14, 876 P.2d at 1132 n. 14.

¶ 19 We now expressly consider the question left open in *Action No. S–114487*, that is, whether the statutory test for abandonment applies to severance actions involving married, as well as unmarried, parents. We discern no reason for refusing to apply the statutory test. The same factors that we considered in *Action No. S–114487* in the context of an unwed father apply when a court considers whether the rights of a child's married parents should be terminated. The statutory directive that the court consider the best interests of the child emphasizes the need for a "prompt determination of where and by whom the child is to be raised and nurtured," *id.* at 97, 876 P.2d at 1132, a need that does not change for the child regardless of the marital status of the parents. Moreover, the statute clearly does not distinguish between married and unmarried parents. We therefore hold that the definition of abandonment set out in section 8–531.1 applies to actions brought to sever the rights of married, as well as unmarried, parents pursuant to A.R.S. section 8–533.

### B.

¶ 20 With this framework before us, we turn to whether reasonable evidence supports the superior court's finding that Michael abandoned Zachariah. "What constitutes reasonable support, regular contact, and normal supervision varies from case to case." *Action No. S–114487*, 179 Ariz. at 96, 876 P.2d at 1131. "Therefore, questions of abandonment ... are questions of fact for resolution by the trial court." *Action No. JS–500274*, 167 Ariz. at 4, 804 P.2d at 733. Moreover, "[w]e view the facts in a light most favorable to affirming the trial court's findings." *In re Maricopa County Juvenile Action No. JS–8490*, 179 Ariz. 102, 106, 876 P.2d 1137, 1141 (1994).

¶ 21 The court of appeals held that abandonment was an improper ground for termination because Michael was incarcerated, and therefore, his conduct must be viewed in that context. *See Michael J.*, 194 Ariz. at 235, 979 P.2d at 1028. We agree that Michael's incarceration affects the court's consideration of whether he abandoned his son. His incarceration alone, however, does not justify a failure to make more than minimal efforts to support and communicate with his child.

¶ 22 Imprisonment, per se, neither "provide[s] a legal defense to a claim of abandonment" nor alone justifies severance on the grounds of abandonment. *In re Pima County Juvenile Action No. S–624*, 126 Ariz. 488, 490, 616 P.2d 948, 950 (App.1980). Rather, incarceration is "merely one factor to be considered in evaluating the father's ability to perform [his] parental obligations." *Id.* As we previously have held, when "circumstances prevent the ... father from exercising traditional methods of bonding with his child, he must act persistently to establish the relationship however possible and must vigorously assert his legal rights to the extent necessary." *Action No. S–114487*, 179 Ariz. at 97, 876 P.2d at 1132. The message to a parent remains that which we set out in *Action No. S–114487*: "do something, because conduct speaks louder than words or subjective intent." *Id.*

¶ 23 The evidence here amply supports the superior court's finding that Michael abandoned Zachariah. Zachariah was born December 25, 1995. In January 1996, the ADES served Michael with a dependency petition. He did not respond and thereby failed to assert his legal rights. Had he done so and requested a hearing, he would have been advised at the dependency hearing of his right to counsel, including appointed counsel if he were indigent. *See* A.R.S. § 8–824.D.1 (West Supp.1999). In February 1996, after being informed that Zachariah had been adjudicated dependent, Michael wrote to the ADES stating he would like to have visits with Zachariah. Although the ADES responded by telling him how to protect his status as a parent, Michael made no

effort to protect his legal rights by taking any of the steps outlined by the ADES. Instead, more than a year passed before the ADES received a letter from Michael's attorney regarding Zachariah. Although the record is unclear as to what Michael knew about his son's placement, he asserts that he discovered Zachariah's whereabouts on his own during his son's first year.

¶ 24 In early 1996, therefore, Michael knew his wife's parental rights were subject to termination and that he was unable to parent Zachariah because he was in prison, yet he made no inquiries about Zachariah. He ignored the dependency proceedings. He took none of the actions even an incarcerated parent can take to establish some bond or connection with a child. He sent no cards, no gifts, no letters; he made no telephone calls to hear his son's voice or to allow his son to hear his father; he neither requested pictures of Zachariah nor provided his own pictures for his son to see. He made no attempt to learn whether Zachariah was thriving or languishing. He provided no support, however minimal it might have been. Whatever his subjective intent as to acting as a parent, his conduct speaks volumes. Under the objective measure established by statute, Michael abandoned Zachariah.

¶ 25 Michael argues, however, that the ADES "bootstrapped" an abandonment finding upon him by hiding his son and denying him visitation. No evidence in the record shows any such action on the part of the ADES. Rather, the ADES instructed Michael about how to obtain appointed counsel and possibly establish visits with Zachariah. Michael chose not to act on that advice. The ADES owed no duty to Michael to ensure that his parental rights were not severed. The burden to act as a parent rests with the parent, who should assert his legal rights at the first and every opportunity. *See Action No. S-114487*, 179 Ariz. at 98, 876 P.2d at 1133. "While the state may not unduly interfere with" a parent's opportunity to develop a relationship with his or her child, "it need not protect the mere biological link that exists if the [parent] fails to step forward." *Id.* at 94, 876 P.2d at 1129.

¶ 26 The superior court had sufficient basis to conclude, by clear and convincing evidence, that Michael abandoned his son.

## IV.

¶ 27 Because we affirm the trial court's order granting severance on the basis of abandonment, we need not consider whether the trial court's findings justified severance on the other grounds announced by the court. To afford guidance for future actions, however, we comment briefly on the other grounds relied upon by the trial court.

### A.

¶ 28 Michael also argued that the trial court erred in terminating his parental rights based upon the length of his prison sentence, and the court of appeals agreed. *See Michael J.*, 194 Ariz. at 234–36, 979 P.2d at 1025–27. Parental rights may be severed "if the sentence of such parent is of such length that the child will be deprived of a normal home for a period of years." A.R.S. § 8–533.B.4. At the time of the severance hearing, Michael still had to serve approximately one year of his 3.5–year sentence. As the court of appeals noted, Arizona has not previously severed parental rights based upon the effect of a sentence that short. The court of appeals did more than note the relatively short length of Michael's sentence, however; the court suggested that a 3.5–year sentence could never justify severance under section 8–533.B.4. *Id.* at 234, 979 P.2d at 1027 ("A severance based on this short duration is tantamount to denying felons their parental rights as a matter of law.").

¶ 29 Section 8–533.B.4 sets out no "bright line" definition of when a sentence is sufficiently long to deprive a child of a normal home for a period of years, and we think the better approach is to consider each case on its particular facts. In some instances, a 20–year sentence might not provide sufficient basis for severing an incarcerated parent's rights, while in another case a 3–year sentence could provide the needed basis. The trial court, in making its decision, should consider all relevant factors, including, but not limited to: (1) the length and strength of

any parent-child relationship existing when incarceration begins, (2) the degree to which the parent-child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the relationship between the child's age and the likelihood that incarceration will deprive the child of a normal home, (4) the length of the sentence, (5) the availability of another parent to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue. After considering those and other relevant factors, the trial court can determine whether the sentence is of such a length as to deprive a child of a normal home for a period of years.

### B.

¶ 30 Michael also argued that the trial court erred in finding that the felonies of which he was convicted were "of such nature as to prove [his] unfitness . . . to have future custody and control" of Zachariah. *See* A.R.S. § 8–533.B.4. We agree that the trial court extended the statute beyond the bounds intended by the legislature.

■ ¶ 31 The charges against Michael arose out of separate incidents. The first incident involved an automobile collision that occurred on January 21, 1995, when Michael was driving with a blood alcohol content of 0.05. Following the collision, Michael attempted to pry open the other driver's window with a tire iron, telling him that, if he did not get out, Michael would "run the iron through his skull," or would "blow out his brains" with a .44 caliber magnum handgun. When the police arrived on the scene, they found a .44 and a 9mm. handgun. Michael received a 3.5–year sentence for aggravated assault. The second incident occurred on July 17, 1995, when police officers investigating the theft of several motorcycles found a sawed-off shotgun in Michael's garage along with the stolen motorcycles. He received a 2.5–year sentence for misconduct involving a weapon. The sentences ran concurrently. Although Michael's convictions for aggravated assault and misconduct involving a weapon involve serious offenses, these crimes do not fall within the types of crimes that indicate unfitness to act as a parent.

■ ¶ 32 ¶ 32 Section 8–533.B.4, in giving examples of the types of crime that can prove a parent's unfitness, refers to crimes such as "murder of another child of the parent, manslaughter of another child of the parent or aiding or abetting or attempting, conspiring or soliciting to commit murder or manslaughter of another child of the parent." The crimes listed in the statute all involve extreme violence, planned or completed, by a parent directed toward one of his children. While the statutory list may not be exhaustive, the crimes defined by the legislature as proving unfitness to have custody and control of children are different in kind than the crimes of which Michael was convicted. Because termination of parental rights involves fundamental interests of parents, as well as of children, the courts must take care not to expand the bases for termination beyond those clearly defined by statute. To justify termination of parental rights, a parent's felony conviction must directly demonstrate the individual's substantial unfitness to parent, as opposed to the general character defects reflected by the commission of any felony.

### V.

¶ 33 For the foregoing reasons, we vacate the court of appeals' opinion. We affirm in part and reverse in part the superior court's ruling.

CONCURRING: CHARLES E. JONES, Vice Chief Justice, STANLEY G. FELDMAN, Justice and FREDERICK J. MARTONE, Justice.

ZLAKET, Chief Justice, concurring in part and dissenting in part.

¶ 34 I reluctantly concur in the result reached by the majority. This child is now over four years old and by all accounts has bonded with his caretakers. It would no longer be in his best interests to deliver him to a father he has never known. Still, I am troubled by several aspects of this case and write separately to address them.

¶ 35 In the past, we have emphasized the need for a "prompt determination of where and by whom [a] child is to be raised and

nurtured." *In re Pima County Juvenile Severance Action No. S–114487*, 179 Ariz. 86, 97, 876 P.2d 1121, 1132 (1994). Much of the delay here is inexplicable and, in a very real sense, has preordained the outcome. For example, ADES announced the intention to seek a severance in its March 1996 letter to Michael but then waited ten months to file a termination petition. The juvenile court hearing did not take place for nearly a year after that. Thus, during the infant's first two, critically formative years, he was building relationships with those who had custody of him, and never saw or was otherwise exposed to his natural father. As best I can tell, nothing other than the passage of time occurred during this period. Certainly, there was no attempt by the state to determine Michael's fitness to parent his child.

¶ 36 I understand that ADES may be working under less than ideal conditions. The agency has historically been underfunded and understaffed. Even so, both ADES and the courts must do more to ensure that these cases are resolved promptly, while preserving the rights of parents and safeguarding the interests of children.[3] Otherwise, delay alone may practically control the outcome, which is totally unacceptable.

¶ 37 I am particularly concerned that ADES made no significant effort to find out whether a parental relationship could be created and maintained. The agency's March 1996 letter demonstrates that it was determined to sever parental rights when the child was only three months old, if not before. Yet, beyond ascertaining that Michael was in prison, it does not appear from the record that ADES did anything to find out whether he was willing or able to be a father. Was it too much to ask that the agency verify whether Michael clearly understood its correspondence, and/or to investigate the type of person he was, the education he had, and the resources he possessed?

¶ 38 I do not agree with the majority that once ADES sent its rather curt letter to Michael, the agency's obligation ended and the burden thereafter fell completely on him. In my view, ADES has a responsibility to assist parents, incarcerated or not, who face termination of their rights. In fact, the court of appeals has recently held that the state's duty to make reasonable efforts to preserve a family, as contained in A.R.S. § 8–533(B)(7), has a constitutional basis. *See Mary Ellen C. v. Arizona Dep't of Econ. Sec.*, 193 Ariz. 185, 191–92, 971 P.2d 1046, 1052–53 (App. 1999). The court called the performance of that obligation a "necessary element" of any governmental attempt to overcome a parent's fundamental right to the care, custody and management of his or her children. *Id.* Because the duty is constitutional, it applies even where, as here, the statute does not specifically require it. *See id.*

¶ 39 I submit that before the state can sever a parent-child relationship it must, wherever possible, make some attempt to preserve it. The right to have custody and care of one's own children is among our most precious liberties. The ability to permanently deprive a parent of that right is one of the most awesome powers of the state. This explains why our courts have repeatedly emphasized that severance is a last resort, to be used "only in the most extraordinary circumstances, when all other efforts to preserve the [parental] relationship have failed." *In re Maricopa County Juvenile Action No. JA 33794*, 171 Ariz. 90, 92, 828 P.2d 1231, 1233 (App.1991); *see also In re Maricopa County Juvenile Action No. JS–500274*, 167 Ariz. 1, 4, 804 P.2d 730, 733 (1990) ("[T]ermination of parental rights is not favored and ... generally should be considered only as a last resort."); *In re Maricopa County Juvenile Action No. JS–5209 and No. JS–4963*, 143 Ariz. 178, 189, 692 P.2d 1027, 1038 (App.1984) ("[S]everance of the parent-child relationship should be resorted to 'only when concerted effort to preserve the relationship fails.' "); *Anonymous v. Anonymous*, 25 Ariz.App. 10, 11, 540 P.2d 741, 742 (1975) (stating that severance is a serious matter and courts should "bend over backwards," if possible, to maintain the parental relationship); *Arizona Dep't of Econ. Sec. v. Mahoney*, 24 Ariz.App. 534, 537, 540 P.2d 153, 156 (1975) ("[T]ermi-

---

**3.** Our Model Court program, pioneered in Pima County and recently adopted statewide for the benefit of Arizona's dependent children, is designed to address this pressing need.

nation of the parent-child relationship should not be considered a panacea[.]"). The legislature has echoed this principle, declaring that "whenever possible, family life should be strengthened and preserved[.]" *Action No. JS–500274,* 167 Ariz. at 5, 804 P.2d at 734 (discussing the legislature's intent in passing the Child Welfare and Placement Law of 1970). If these precepts are to have any practical effect, some requirement must be imposed on the state to nurture the parent-child relationship whenever reasonably possible. I see no evidence of such an effort here.

¶ 40 I submit that ADES and the courts should provide parents with adequate information about what they must do after they are served with a severance or dependency petition. Parents must be fully informed about the proceedings, and fairly advised of their consequences. Many of these people are poor, undereducated, and/or functionally illiterate. Merely writing a letter urging them to get an attorney, as ADES did in this case, is not enough. At the very least, one whose child has been placed in foster care should be told where the child is and how he or she may be contacted. In this case, Michael did not know where his son was or how to reach him. Perhaps he could have communicated with his child through ADES, but no one bothered to tell him that. It is disturbing that the agency was unwilling to take even this small step to assist the father, presumably because he was in prison.

¶ 41 Finally, I find the majority's abandonment analysis unconvincing. I agree that the "settled purpose" rule and other past legal constructs relied on by courts ought to be discarded. The definition found in A.R.S. § 8–533(1) should apply in all situations. Nevertheless, in my view the state failed to prove abandonment under the statute by clear and convincing evidence.

¶ 42 The majority criticizes Michael for not responding to the dependency petition. It asserts that "[h]ad he done so and requested a hearing, he would have been advised at the dependency hearing of his right to counsel, including appointed counsel if he were indi-

gent." The criticism is unfounded. Although it may not have been a formal pleading, Michael wrote to ADES explaining that he wished to parent his child upon release and requesting visitation in the meantime. Under the circumstances, he responded in a very predictable way. It is unreasonable to expect an incarcerated parent, with no access to counsel, to be versed in the niceties of procedural law. Moreover, in the absence of adequate explanation by the state, there is no realistic way for most prisoners to learn what they must do to protect their rights.

¶ 43 The majority faults Michael for not writing to his child or sending him gifts. I am unimpressed by this criticism and find it an extremely weak basis for an abandonment finding. Michael was in prison. It is beyond dispute that incarceration severely hinders a parent's ability to provide meaningful supervision or support to his or her child. *See* Phillip M. Gentry, *Procedural Due Process Rights of Incarcerated Parents in Termination of Parental Rights Proceedings: A Fifty State Analysis,* 30 J. Fam. L. 757, 827 (1991). While confinement does not absolve the parent of all responsibilities, it must be given great weight in the abandonment analysis. *See In the Interest of M.D.S.,* 16 Kan. App.2d 505, 825 P.2d 1155, 1159 (1992) (observing that to hold otherwise "would effectively render termination an automatic result of any lengthy incarceration, and perhaps any incarceration at all"). The practical obstacles created by imprisonment were particularly evident in this case. Michael was the father of a newborn. Letters or phone calls directly to the child would have provided little, if any, meaningful contact. Moreover, ADES had effectively limited his access by not telling him where the boy was.

¶ 44 Because of the child's young age, Michael needed personal contact with his son to develop any meaningful relationship, and in fact, he requested visitation. As a matter of agency policy, however, ADES refuses to allow incarcerated parents face to face visits with their infant children. An ADES caseworker testified to this fact at the severance hearing.[4] Thus, Michael was denied his only

---

4. As the caseworker put it: "We try not to expose    children, you know, to prison, you know [ ],

real avenue of parental contact, solely because he was incarcerated. Obviously, then, imprisonment impaired his ability to maintain a "normal parental relationship with [his] child" within the meaning of A.R.S. § 8–533(1).

¶ 45 The majority also seems to confuse the trappings of a relationship with the genuine article. It says that Michael should have gone through the motions of sending cards, letters and gifts to his child, in order to demonstrate the depth of his interest. Even assuming the man's ability to do these things, this young child would not have known who the items were from or what they meant, nor would they have served to enhance a relationship that had never been permitted to develop in the first instance. Father and son had never been allowed to meet.

¶ 46 In short, I believe it was not Michael who dropped the ball here. Instead, it was the courts and those governmental agencies that had an affirmative duty to preserve the parent-child relationship to the extent it was reasonably possible. Admittedly, Michael did not do all that he might have done to protect his rights. But ADES was determined from the outset to sever parental rights, apparently ignoring the legal principle that incarceration does not automatically render a parent unfit. Even the majority concedes that the crime for which this father had been imprisoned was not of such a nature to preclude him from parenting. That concession is made meaningless by the unrealistic burden imposed on him by today's decision.

young children to prison facilities anymore [sic] than we have to. And we didn't feel it would be

in [the child's] best interest to be exposed to that atmosphere." Tr. at 15.