NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

LATOYA L., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, T.L., J.L., *Appellees.*

No. 1 CA-JV 19-0394
FILED 5-5-2020

Appeal from the Superior Court in Maricopa County
No. JD531003
The Honorable Norman J. Davis, Judge (retired)
The Honorable Jennifer E. Green, Judge

**AFFIRMED**

COUNSEL

Robert D. Rosanelli, Phoenix
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Presiding Judge Paul J. McMurdie delivered the decision of the Court, in which Judge Jennifer B. Campbell and Vice Chief Judge Kent E. Cattani joined.

---

**M c M U R D I E**, Judge:

¶1        LaToya L. ("Mother") appeals from a juvenile court order terminating her parental relationship to her children, Tremaine and Ja'Lottie. The fathers of the children had their parental rights severed in different termination proceedings and are not parties to this appeal. For the following reasons, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2        In July 2016, Mother considered herself homeless and faced the possibility of incarceration for a burglary in Louisiana. Mother sent the children to their maternal grandfather ("Grandfather"), who lived in Arizona, to care for them. Mother provided a power of attorney to Grandfather and his significant other, Alicia. In October 2016, Mother was convicted of burglary and placed on three years' supervised probation. She absconded from supervised probation and did not retrieve the children from Grandfather.

¶3        When the power of attorney expired, Grandfather asked Mother for the children's birth certificates and social-security cards so he could enroll them in school. She refused. Mother and Grandfather's relationship became strained, and eventually, Grandfather initiated a guardianship action.

¶4        The Department of Child Safety ("DCS") began to investigate Mother in June 2017 after the children's guardian *ad litem* filed a dependency petition. At that time, Grandfather and Alicia had ended their relationship, but the children remained with Alicia as a kinship placement and licensed foster-care provider.

¶5        In August 2017, Mother was arrested in Louisiana on suspicion of committing another offense. While in custody, the police became aware of her outstanding warrant for absconding from probation, so they detained Mother pending resolution of the probation-revocation

proceedings. The court ultimately revoked Mother's probation and sentenced her to three years' imprisonment. Mother was incarcerated in Louisiana until August 1, 2018, when she qualified for parole. As a condition of her parole, Mother was required to remain in Louisiana for approximately two years.

¶6        While incarcerated, DCS attempted to set up services and phone calls with the facility, but Mother did not qualify for services while on work release. DCS began the process of placing the children with their maternal grandmother in Louisiana but stopped when their grandmother stated she did not want to be their placement. During this time, Mother was able to appear telephonically at several hearings, and Grandfather and Alicia brought the children to visit family in Louisiana and took the children to see Mother. Additionally, DCS encouraged Mother to send cards, letters, gifts, or whatever she could afford to her children; and Mother did send a few letters.

¶7        Shortly after her release in August 2018, Mother made a quick phone call to DCS and promised to contact them later. DCS requested Mother's parole officer's contact information, but Mother did not provide it. DCS and Mother did not communicate again until February 2019, when Mother attended a hearing telephonically. DCS again requested Mother's contact information, and Mother gave DCS the maternal grandmother's phone number and address. When DCS later called the maternal grandmother to speak with Mother, the grandmother stated that Mother did not live there.

¶8        On March 13, 2019, DCS moved for termination of Mother's parent-child relationship alleging abandonment and nine months' time-in-care. DCS alleged Mother abandoned her children, noting she had not had any contact with them after her release from prison in August 2018, nor had Mother provided financial support for them.

¶9        In April 2019, Mother completed an in-patient thirty-day detoxification program. In May 2019, Mother reinitiated contact with DCS and indicated that she had secured housing. However, after a relapse with alcohol and marijuana, Mother voluntarily re-admitted herself into the same in-patient treatment facility in August 2019 and again substantially completed the program. Additionally, Mother partially completed subsequent out-patient substance-abuse programs after the first in-patient treatment program. Mother also participated in parenting classes, urinalysis, and counseling through the treatment programs.

¶10  From June to August 2019, Mother participated in intermittent supervised phone calls with the children. After the calls between Mother and the children resumed, Tremaine was diagnosed with depression. Both children would cry after the phone calls, and Tremaine exhibited behavioral issues. In October 2019, the children's therapist recommended that DCS discontinue the phone calls due to their inconsistency and for Tremaine's mental stability.

¶11  Mother moved to Arizona and began working with a shelter to get established. DCS organized drug testing for Mother, which Mother eventually completed. DCS also scheduled an interview with an outpatient treatment center.

¶12  The court conducted a two-day contested termination hearing in November 2019. DCS called Mother's case managers to testify concerning the allegations of abandonment. The case managers testified that: (1) during her incarceration, Mother could not engage in services with DCS and had little contact with the children; (2) after she was released from prison, Mother had limited or no contact with her children or DCS for over six months, and (3) Mother was unemployed, and she did not know if she would remain in Arizona or move back to Louisiana. The case managers also opined that termination of Mother's parental relationship was in children's best interests because their current placement was meeting their needs, termination would provide them with permanency and stability, they had bonded with a placement that was willing to adopt them, and they were otherwise adoptable.

¶13  The juvenile court found that DCS had proven the abandonment and nine months' time-in-care ground and issued an order terminating Mother's parental relationship with the children. Mother appealed, and we have jurisdiction under Arizona Revised Statutes ("A.R.S.") section 8-235(A) and Arizona Rule of Procedure for the Juvenile Court 103(A).

**DISCUSSION**

¶14  Mother argues the juvenile court abused its discretion by finding she had abandoned her children because other factors inhibited her

ability to maintain a normal parental relationship with them.[1] Specifically, Mother contends the "Louisiana prison system, her lack of a phone, [Grandfather], and the failure of [DCS] to consistently facilitate phone contact," frustrated her efforts to maintain a normal parent-child relationship. We review the juvenile court's termination order for an abuse of discretion and "will affirm if it is supported by sufficient evidence in the record." *Kenneth B. v. Tina B.*, 226 Ariz. 33, 36, ¶ 12 (App. 2010). "We view the facts in the light most favorable to sustaining the [juvenile] court's decision." *Id.*

¶15　　　　The juvenile court may terminate a parent-child relationship if it finds there is clear and convincing evidence that a parent has abandoned a child, and that termination of the parent-child relationship is in the child's best interests. A.R.S. § 8-533(B)(1); *Kenneth B.*, 226 Ariz. at 36, ¶ 13. "Abandonment" is defined as:

> [T]he failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

A.R.S. § 8-531(1). "[A]bandonment is measured not by a parent's subjective intent, but by the parent's conduct." *Michael J. v. ADES*, 196 Ariz. 246, 249, ¶ 18 (2000). "[I]n deciding whether a parent has abandoned a child as defined in [A.R.S] § 8-531(1), a court should consider each of the stated factors—whether a parent has provided 'reasonable support,' 'maintain[ed] regular contact with the child' and provided 'normal supervision.'" *Kenneth B.*, 226 Ariz. at 37, ¶ 18 (alteration in original) (quoting A.R.S. § 8-531(1)); *see Michael J.*, 196 Ariz. at 249–50, ¶ 18. Conduct that amounts to reasonable support, regular contact, and normal supervision will vary depending on

---

[1]　　　　Mother also argues the juvenile court erred by terminating her parental rights under the nine months' time-in-care ground, A.R.S. § 8-533(B)(8)(a), because DCS failed to provide appropriate reunification services. "If clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds." *Jesus M. v. ADES*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).

the facts of each case. *Michael J.*, 196 Ariz. at 250, ¶ 20. Incarceration alone does not demonstrate nor excuse a finding of abandonment; instead, it is a factor to consider in evaluating a parent's performance of their parental obligations. *Id.* at ¶ 22; *Pima County Juv. Action No. S-624*, 126 Ariz. 488, 490 (App. 1980).

**¶16**         Here, the juvenile court found that "[f]rom approximately February 2018 to August 1, 2018[,] Mother made no financial contributions to the children's support, and failed to provide cards, letters or gifts to the minor children." The juvenile court also found that "[b]etween August 2018 and June 12, 2019, Mother made little efforts to contact DCS or maintain a relationship with the children." Finally, the court found that:

> Mother's voluntary absence from the lives of the children for more than three years with only minimal contact during this time clearly meets [the *prima facie*] standard of abandonment. Mother's minimal post-petition attempts to reestablish a parental relationship with the children do not automatically rebut this prima facie case of abandonment.

Based on these findings, the court concluded DCS had established by clear and convincing evidence that Mother had abandoned the children.

**¶17**         Reasonable evidence supports these findings. Mother has been largely absent from her children's lives for several periods, each lasting over six months. During her incarceration, Mother only sent a few letters and saw her children one time in the spring of 2018. Mother did not send gifts or financial support to the children, even though she was on work release and earned income starting in February 2018. Mother remained in contact with Grandfather and "could hear [the children] in the background" of the calls but did not have direct contact with the children. Although Mother's options were certainly limited during this period, Mother did not make more than token efforts to maintain a parental relationship with the children. After her release, Mother had little or no contact with her children until June 2019. Mother admitted during her testimony that she did not call the children and did not send gifts, financial support, or letters from August 2018 to February 2019. And after August 20, 2018, DCS was unable to communicate with Mother or locate her until at least February 2019.

**¶18**         At the termination trial, Mother did not dispute these facts, but claimed: (1) she attempted to contact the children through Grandfather, but he refused to accommodate her out of fear of getting in trouble with

DCS; (2) she asked Grandfather if she could send the children gifts, but he rejected the idea; (3) DCS failed to facilitate telephone calls between her and the children while she was incarcerated and after her release; (4) she did not have a phone from August 2018 to March 2019; and (5) she tried calling DCS frequently through the maternal grandmother but because she received no answer she left voicemails.

**¶19**        "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. ADES*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). We cannot say the court abused its discretion by finding Mother's proffered reasons unpersuasive and concluding Mother had failed to maintain a parental relationship with the children for a period of more than six months—*prima facie* evidence of abandonment.

**¶20**        Nor can we say the court erred by finding that Mother's post-petition efforts had not rebutted this *prima facie* evidence of abandonment. Although Mother recently resumed communicating with her children and moved to Arizona, the communication was intermittent at best, and the children's therapist recommended the communication end because of the children's behavioral issues attributed to that communication. Under these circumstances, the juvenile court did not abuse its discretion by concluding that Mother had abandoned her children. Accordingly, the juvenile court did not err by terminating Mother's parental relationship with the children.[2]

---

[2]        Mother does not challenge the juvenile court's finding that termination of her parental relationship with the children is in their best interests. Thus, we need not address the issue in this appeal. *See Michael J.*, 196 Ariz. at 249, ¶ 13.

## CONCLUSION

**¶21** We affirm the order terminating Mother's parental relationship to Tremaine and Ja'Lottie.

