NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

DEANDRE F., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, A.F., *Appellees*.

No. 1 CA-JV 21-0274
FILED 3-17-2022

Appeal from the Superior Court in Maricopa County
Nos. JD532638
JS519776
The Honorable Kristin Culbertson, Judge

**AFFIRMED**

COUNSEL

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Appellant*

Arizona Attorney General's Office, Mesa
By Thomas Jose
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

---

Judge Randall M. Howe delivered the decision of the court, in which Presiding Judge Jennifer B. Campbell and Judge James B. Morse Jr. joined.

---

**H O W E**, Judge:

¶1   Deandre F. ("Father") appeals from the juvenile court's ruling terminating his parental rights to his daughter A.F., born 2017, on the ground of abandonment. For the following reasons, we affirm.[1]

## FACTS AND PROCEDURAL HISTORY

¶2   We view the facts in the light most favorable to sustaining the juvenile court's order. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 2 ¶ 2 (2016). Father is A.F.'s biological father. He never married A.F.'s mother, signed his name on A.F.'s birth certificate, or established paternity through the family court. He lived with Mother and A.F. from her birth until late 2018. Although Mother had allowed unsavory friends in the home and allegedly used methamphetamine and cocaine in A.F.'s presence, Father left A.F. with Mother and moved to Tennessee. The Department of Child Safety initially got involved in 2019 after learning that Mother and A.F. were homeless and A.F. was exposed to drugs. A family friend picked up A.F. from a known drug house and delivered her to the Department who took custody of the child. The Department placed A.F. with Mother's family friend.

¶3   Father's identity was initially unknown. The Department searched for a person named "Dre [F.]" and believed another man to be the father. The Department petitioned for dependency and paternity as to John Doe and the other man, alleging neglect. The Department also moved to terminate parental rights.

¶4   Father's identity became known after he sent Mother one dollar on three separate occasions so that she would call him. The Department amended the dependency petition and motion to terminate to identify Father and allege abandonment. Although his identity was known,

---

[1]  A.F.'s mother is not a party to this appeal; her parental rights were terminated in 2020.

he continued to be difficult to locate. The Department found addresses in both Arizona and Tennessee, but certified letters sent to those addresses were returned. Father was then served by publication.

¶5        Father appeared in April 2021 for his initial dependency hearing, which was continued. He then took a paternity test, which showed a 99.99% probability of paternity. The Department moved for summary judgment on paternity. The court granted summary judgment and found that Father was A.F.'s biological father. Father appeared at the continued initial dependency hearing and contested the allegations in the petition. In early 2021, the Department petitioned to terminate Father's parental rights based on abandonment. The court held a combined dependency and termination hearing in July 2021.

¶6        Father testified that he was present when A.F. was born but did not sign the birth certificate. When asked why he did not establish paternity sooner, he stated, "No, I never will do nothing like that . . . [b]ecause I know once you get them that sample, they going to put you in the system . . . and they're going to bury you." Asked why he did not call the police if he knew that Mother was allowing her unsavory friends into the home, he responded, "I don't need to call no cops on nobody because I ain't got time to have you all in my business, even though you all in it now." Father also admitted that he had not parented A.F. since she was a year old and claimed that he did not believe that Mother was using drugs when they lived together. He also testified that the last time he saw A.F. in person was in 2018. When asked about how he kept in contact with A.F., he testified that he sporadically sent Mother money, totaling about $250, and visited Arizona in 2019 only to find others living at Mother's residence. He came back in 2020 only to contract Covid-19, and Mother would not answer his calls. He added that when he finally got into contact with Mother, he did not speak with A.F. and claimed that Mother was interfering with his parental relationship by blocking him on social media and changing her phone number. He began weekly telephonic visits with A.F. after she was already in foster care, but never sent her cards, gifts, or letters. He testified that he signed up for a life insurance policy and named her as the beneficiary.

¶7        The Department case manager testified that the Department had concerns about Father's lack of a relationship with A.F. Since the Department got into contact with him, however, he had weekly phone calls with A.F. that lasted five-to-ten minutes. She also testified that A.F. was "thriving" in her placement and that the foster family was willing to adopt her.

¶8　　　　　On the dependency issue, the court found that A.F. was dependent as to Father. On the termination issue, the court found that the Department proved by clear and convincing evidence that Father had abandoned A.F. The court did not find Father to be a credible witness when he testified about not establishing paternity sooner and believing that Mother was not using drugs when they lived together. The court also found that Mother's alleged interference with Father's and A.F.'s relationship did not constitute a defense to his abandonment of the child. The court made findings of fact to support its termination decision, including that Father did not establish paternity, left the child with Mother—whom he knew was using drugs and had "strangers" in the home—and never verified the child's safety after he left. The court also found that he failed to contact the child for almost two-and-a-half years, did not send gifts, cards, or letters to A.F., and the sporadic monetary support Father claimed to have provided was "woefully inadequate to constitute reasonable support." The court also found that termination was in A.F.'s best interests and granted the Department's petition to terminate his parental rights. Father timely appealed.

## DISCUSSION

¶9　　　　　Father argues that the juvenile court erred by terminating his rights to A.F. based on abandonment.[2] A juvenile court's termination determination is reviewed for an abuse of discretion. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 58 ¶ 9 (App. 2015). Because the juvenile court is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts, *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334 ¶ 4 (App. 2004), we will affirm a termination decision unless no reasonable evidence supports it, *Xavier R. v. Joseph R.*, 230 Ariz. 96, 100 ¶ 11 (App. 2012).

¶10　　　　To terminate parental rights, the juvenile court must find the existence of at least one statutory ground under A.R.S. § 8–533 by clear and convincing evidence and must find that termination is in the child's best interests by a preponderance of the evidence. A.R.S. § 8–533(B); Ariz. R.P. Juv. Ct. 66(C); *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286 ¶ 15 (App. 2016). One such ground is abandonment, A.R.S. § 8–533(B)(1), which means

---

[2]　　　　Father does not challenge the court's best interests determination; thus, we assume that he concedes the finding as accurate. *See Britz v. Kinsvater*, 87 Ariz. 385, 388 (1960).

the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment,

A.R.S. § 8–531(1). A finding of abandonment requires the court to consider each factor: whether a parent has (1) provided reasonable support to the child, (2) maintained regular contact with her, and (3) provided normal supervision. *Kenneth B. v. Tina B.*, 226 Ariz. 33, 37 ¶ 18 (App. 2010). A parent's conduct determines abandonment, not a parent's subjective intent. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249 ¶ 18 (2000). A parent bears the burden to act as a parent and "should assert his legal rights at the first and every opportunity." *Id.* at 251 ¶ 25. When a parent cannot exercise traditional methods to bond with the child, "he must act persistently to establish the relationship however possible and must vigorously assert his legal rights to the extent necessary." *Id.* at 251 ¶ 22 (quoting *In re Pima Cnty. Juv. Severance Action No. S–114487*, 179 Ariz. 86, 97 (1994)).

¶11 Reasonable evidence supports termination of Father's parental rights based on abandonment. He had no contact with the child for two-and-a-half years. He moved out of Arizona and left A.F. with Mother, whom he knew was abusing drugs and associating with unsavory friends. Aside from sending sporadic monetary support, he failed to provide A.F. with reasonable support in the form of gifts, clothes, cards, and food. *See Kenneth B.*, 226 Ariz. at 37 ¶ 20. Nor did he make efforts to establish paternity on her birth certificate or through the family court.

¶12 Father cites *Calvin B. v. Brittany B.*, 232 Ariz. 292 (App. 2013), and argues that Mother prevented him from having a normal parental relationship with A.F. by blocking him on social media and changing her phone number. Unlike the facts in that case, however, Father here did not show that Mother prevented him from having a normal parental relationship with A.F. because he did not actively seek more involvement with the child despite Mother's alleged interference. *See id.* at 297 ¶ 22 (despite mother's attempts to prevent father from seeing son, reversal of abandonment finding was warranted because father "continued to seek visits," managing about 10 visits a year). Here, the record shows that Father did not see the child in person after leaving Arizona in 2018 and did not have phone contact with her until she was already in foster care. These calls

only lasted between five and ten minutes. Although Father attempted to contact Mother a few times to speak with A.F., he concedes that he could have established paternity and sought parenting time but chose not to involve the court. Doing so would have also provided him earlier notice of the proceedings. The record does not support Father's argument that Mother's actions prevented his ability to parent the child.

¶13 Because reasonable evidence supports the juvenile court's termination decision, the court did not abuse its discretion.

## CONCLUSION

¶14 For the foregoing reasons, we affirm.

