IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STEVEN M., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, A.M., A.M., A.M., *Appellees*.

No. 1 CA-JV 22-0054
FILED 2-2-2023

Appeal from the Superior Court in Maricopa County
No. JD40962
The Honorable David O. Cunanan, Judge (Retired)

**AFFIRMED**

COUNSEL

Czop Law Firm PLLC, Higley
By Steven Czop
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Bailey Leo
*Counsel for Appellee Department of Child Safety*

## OPINION

Judge Randall M. Howe delivered the opinion of the court, in which Presiding Judge David D. Weinzweig and Judge D. Steven Williams joined.

H O W E, Judge:

¶1        Steven M. ("Father") appeals from the juvenile court's ruling terminating his parental rights to his three children with Shannon M. ("Mother"), born in 2011, 2013, and 2015, on the ground of abandonment. Father contends, among other arguments, that the Department of Child Safety ("DCS") was required under *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574 (2021), to give him a "chance to prove parental fitness" before moving to terminate his parental rights on the ground of abandonment.

¶2        We reject Father's argument because *Jessie D.* requires DCS to make reasonable efforts to provide reunification services to an incarcerated parent if, among other conditions, the incarcerated parent requests reunification services. *Id.* at 582 ¶ 21. In this case, Father did not request reunification services while he was incarcerated. Because we reject Father's argument and the other arguments discussed below, we affirm the juvenile court's order terminating Father's parental rights.

## FACTS AND PROCEDURAL HISTORY

¶3        We view the facts in the light most favorable to sustaining the juvenile court's order. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 2 ¶ 2 (2016). In 2016, around one year after the youngest child was born, Father separated from Mother and left the family home.[1] He never petitioned the family court for parenting time and legal decision-making authority over the children.

¶4        In January 2018, Father was charged with two felonies and taken into custody, where he remained until being sentenced. In April 2018, he was placed on a two-year supervised probation term and released from custody. Less than three months later, he was arrested for violating his

---

[1]        Mother and her partner Christopher Y. (with whom Mother shares other children) are not parties to this appeal; Mother's parental rights were terminated.

probation and was sentenced to prison in early 2019. He was released from prison in September 2021. About three months after his release, he contacted DCS to request visitation. He also participated in drug testing and an intensive outpatient program that provides housing, counseling, and assistance in securing employment.

¶5             The children had lived with Mother and her new partner since 2016, after Father and Mother ended their relationship. DCS received several neglect and physical abuse reports about the children after Father moved out. DCS received the latest report of neglect in June 2021, when Father was incarcerated. A DCS investigator found the children living in the mother's home in unhealthy and hazardous conditions, with significant medical needs and a general lack of food. The home was also frequented by strangers. DCS immediately took physical custody of the children.

¶6             DCS simultaneously petitioned to establish Father's paternity of the children and for their dependency as to Father, alleging neglect due to abandonment and incarceration. The juvenile court found the children dependent and adopted a case plan of severance and adoption. Then, DCS moved to terminate parental rights due to abandonment and Father's incarceration on a felony sentence that would deprive the children of a normal home for a period of years. DCS later dropped the length of felony sentence as a ground for termination.

¶7             At the termination hearing, the DCS case manager testified that Father had failed to give the children a stable home and protection from physical harm and neglect. Father's contact with the children before his incarceration was "sporadic and non-existent." His contact with the children during his incarceration was non-existent. Although he was given the opportunity to send letters to the children while he was in prison, the children did not receive any letters or have any other contact with him. She also testified that termination was in the best interests of the children because it would provide them with stability and safety. Finally, she testified that the children were in adoptable placements that were meeting their needs. Dr. Erin South, the DCS unit consultant, testified that because the children did not consider Father their father and did not want to see him, it could be traumatic for the children to force contact between them.

¶8             Father testified that he visited the children at least twice a week until he was incarcerated. He also testified he gave them gifts and financial support. Yet Father conceded he was unaware that DCS was ever involved with the children, or that DCS investigators found the children living in hazardous conditions in June 2021. The last time Father saw the

children was a few weeks before he was first incarcerated, sometime in the spring or summer 2018. Finally, he testified that during his incarceration, he sent letters to the children. He did not, however, present any evidence corroborating his testimony.

**¶9** The juvenile court, after considering and weighing all the evidence, found that DCS had proved abandonment and that termination was in the children's best interests. The juvenile court found that although Father "made some different statements, the most credible evidence is that Father did not have a significant relationship with those children [] before he got incarcerated in that facility." It also found that before Father's "sentencing and incarceration, he had not maintained a relationship with his children since at least 2016/2017 when he and Mother separated and he moved away from the family home." Finally, it found that Father had failed to provide financial support to the children and maintain contact with the children since his incarceration in the fall of 2018. It therefore terminated Father's parental rights. Father timely appealed.

## DISCUSSION

**¶10** Father argues that the juvenile court erred in terminating his parental rights. We accept the juvenile court's factual findings if reasonable evidence supports them and will affirm a termination decision unless clearly erroneous. *Demetrius L.*, 239 Ariz. at 3 ¶ 9.

**¶11** To terminate parental rights, the juvenile court must find by clear and convincing evidence the existence of at least one statutory ground under A.R.S. § 8–533 and by a preponderance of the evidence that termination would be in the child's best interests. A.R.S. § 8–533(B); Ariz. R.P. Juv. Ct. 66(C);[2] *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286 ¶ 15 (App. 2016). One such ground is abandonment, A.R.S. § 8–533(B)(1), which is defined as "the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision." A.R.S. § 8–531(1). A parent's "[f]ailure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment." *Id*.

**¶12** A finding of abandonment requires the court to consider whether a parent has (1) provided reasonable support to the children, (2) maintained regular contact with them, and (3) provided normal

---

[2] We cite the rule in effect at the time of the termination hearing; it has since been renumbered and amended.

supervision. *Kenneth B. v. Tina B.*, 226 Ariz. 33, 37 ¶ 18 (App. 2010). A parent's conduct determines abandonment, not a parent's subjective intent. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249 ¶ 18 (2000). "The burden to act as a parent rests with the parent, who should assert his legal rights at the first and every opportunity." *Id*. at 251 ¶ 25 (citation omitted). When a parent cannot exercise traditional methods to bond with the children, "he must act persistently to establish the relationship however possible and must vigorously assert his legal rights to the extent necessary." *Id*. at 250 ¶ 22 (quoting *In re Pima Cnty. Juv. Sev. Action No. S–114487*, 179 Ariz. 86, 97 (1994)).

**¶13**　　Reasonable evidence supports the termination of Father's parental rights based on abandonment. According to the DCS case manager, Father had little or no contact with the children before he was incarcerated. He had not lived with the children for over five years, and he never petition the family court for parenting time or legal decision-making authority over the children. During his incarceration, the contact was non-existent. Father had not seen the children for over three years. The juvenile court found Father's conflicting testimony was not credible, and Father provided no evidence of financial support to the children, or evidence of letters, gifts, or cards that he sent to the children. Thus, the juvenile court did not err in finding that DCS has proved by clear and convincing evidence that Father had abandoned the children.

**¶14**　　Father cites *Jessie D.* to argue that DCS was required to give him a "chance to prove parental fitness" before moving to terminate his parental rights on the abandonment ground. *Jessie D.* requires DCS to make reasonable efforts to provide reunification services to an incarcerated parent if (1) DCS "seeks to terminate parental rights under [A.R.S.] § 8 –533(B)(4)'s provision addressing the parent's length of felony sentence," (2) the "incarcerated parent requests reunification services," and (3) "providing the services will not endanger the child." *Id*. at 582 ¶ 21. The record here does not show that Father requested reunification services while he was incarcerated. Because Father did not request such services while incarcerated, DCS was not required to provide Father with reunification services while he was incarcerated. Because the second condition is not met, considering the other conditions is unnecessary.

**¶15**　　Father argues next that the juvenile court erred in finding that termination served the children's best interests. Termination of parental rights is in a child's best interests if the child will benefit from the termination or will be harmed if the relationship continues. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150 ¶ 13 (2018). In determining whether the

child will benefit from termination, relevant factors include whether the current placement is meeting the child's needs, an adoption plan is in place, and if the child is adoptable. *Demetrius L.*, 239 Ariz. at 3–4 ¶ 12. The juvenile court may find that continuing the parent-child relationship would be detrimental to the child's well-being because the child would linger in care with no prospect of reunifying with the parent. *See Aleise H. v. Dep't of Child Safety*, 245 Ariz. 569, 571–72 ¶¶ 6, 10 (App. 2018). In determining whether the termination is in the child's best interest, the juvenile court must consider the totality of circumstances. *Alma S.*, 245 Ariz. at 150–51 ¶ 13.

**¶16**         Reasonable evidence supports the juvenile court's best interests finding. The DCS case manager testified that termination would provide the children with a sense of stability and safety. She also testified that the children were in adoptable placements that were meeting their needs. Dr. South testified that because the children did not think of Father as their father and they did not want to see him, forcing contact between them could traumatize the children.

**¶17**         Father argues, however, that the court failed to consider in its best interests analysis his rehabilitation efforts—his request for contact with the children upon his release, and his participation in a drug-testing program and counseling. While the juvenile court should "consider a parent's rehabilitation efforts as part of the best-interests analysis," it must not "subordinate the interests of the child to those of the parent once a determination of unfitness has been made." *See Alma S.*, 245 Ariz. at 151 ¶ 15; *see also Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 478 ¶ 31 (2022) ("The 'balancing' performed by the juvenile court during the best-interests inquiry does not pit the parent's interests against the child's best interests to determine which predominate; at this stage, it is a given that the child's best interests predominate."). The juvenile court here explicitly noted that it considered and weighed all the evidence before it. And the evidence before it included Father's requests for contact with the children upon his release, and his participation in a drug-testing program and counseling. Father's argument, thus, merely asks this court to reweigh the evidence, which we will not do. *See Williams v. King*, 248 Ariz. 311, 317 ¶ 26 (App. 2020). Reasonable evidence supports the juvenile court's best interests findings.

**CONCLUSION**

¶18        For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:   AA