NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO A.M.

No. 1 CA-JV 23-0127
FILED 10/24/2023

Appeal from the Superior Court in Maricopa County
No. JS21439
The Honorable Amanda S. Chua, Judge *Pro Tempore, Retired*

**AFFIRMED**

COUNSEL

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant*

Vierling Law Offices, Phoenix
By Thomas A. Vierling
*Counsel for Appellee*

**MEMORANDUM DECISION**

Judge Daniel J. Kiley delivered the decision of the Court, in which Vice Chief Judge Randall M. Howe and Judge Jennifer M. Perkins joined.

**K I L E Y**, Judge:

¶1        Elias N. ("Father") appeals the juvenile court's order terminating his parental rights to his child, A.M. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        Father and Diana M. ("Mother"), who never married, are the biological parents of A.M., born in 2011. Although their relationship ended during Mother's pregnancy, Father was present at A.M.'s birth.

¶3        Viewed in the requisite "light most favorable to sustaining the juvenile court's order," *In re O.M.*, 254 Ariz. 543, 544, ¶ 3 (App. 2023), the evidence shows that until A.M. was four years old Father visited her "about once a week" at her maternal grandmother's home, where she and Mother lived. Mother "facilitat[ed]" these visits by "transporting [Father] to see [A.M.]."

¶4        Father's visits with A.M. gradually became "more inconsistent" until Mother "lost contact" with Father altogether in 2016. Because A.M. was "asking for him a lot," Mother tried contacting Father by "reach[ing] out to his brother on Instagram." Father's brother informed her that Father "didn't have a phone number" and suggested she try reaching him by calling A.M.'s paternal grandmother. He also promised to let Father know that Mother was trying to contact him. About two months later, Father called Mother from his mother's phone but did not provide a current number for himself.

¶5        In 2017, Mother "went to court regarding child support." After Father stated at the support hearing that "he wasn't working and . . . was struggling with his health," Mother withdrew her request, and the family court issued an order setting child support at "zero." Mother and Father "did not enter any agreements regarding parenting time or legal decisions." However, Mother urged Father to "come see" A.M., telling him "how much this child loved him."

¶6        One day in late 2017, Father picked A.M. up from the maternal grandmother's home and spent "all day" with her. Mother supported the visit because spending time with Father "made [A.M.] happy." Father also dropped off presents for the child on Christmas in 2017 but, for reasons that the record does not make clear, did not see her that day.

¶7           Mother met Ricardo A. in 2017, and they married in 2020.

¶8           Mother changed her phone number in 2018. She did not provide Father with the new number because, she later explained, she "didn't have contact with [him] any more [*sic*]." However, she remained in contact with his siblings via social media.

¶9           Father called the maternal grandmother once in 2018 to ask about visiting A.M. However, A.M. "was going to Mexico" for "a vacation," so he did not see her.

¶10          Since then, Father has not visited or communicated with A.M. at all. At trial, Father claimed that he didn't "reach out" to arrange a visit with A.M. because he purportedly "had no way of contacting" Mother, but he admitted that he could have called the maternal grandmother if he wanted to see A.M.

¶11          In December 2019, Father suffered injuries during a "very serious accident" that left him in a coma. As a result, he experienced significant memory loss and spent three months in the hospital "learning to speak, talk, and walk again." At trial in March 2023, Father stated that his memory is still impaired and that he is unable to work because of his injuries.

¶12          During his hospitalization, Father's sister "Susan" (a pseudonym) reached out to Mother via social media, told her about Father's accident, and asked her to bring A.M. to the hospital to visit him. Concerned about how seeing Father in an injured state and "possibly[] . . . not even remembering" A.M. might affect the child's "mental health," Mother declined.

¶13          Shortly thereafter, Susan reached out to Mother "about dropping off gifts" for A.M. Mother again declined, explaining that A.M. had already gone through the process of "healing" from Father's absence, which could be undermined by renewed contact with Father's sister.

¶14          Throughout A.M.'s life, Father has "never paid child support," and A.M. has never lived with him.

¶15          In September 2022, Mother petitioned to terminate Father's parental rights on grounds of abandonment and incapacity under A.R.S. § 8-533(B)(1) and (B)(3), respectively. In her petition, Mother listed her home address as "protected" because she "did not know in what emotional, mental state [Father] was going to be."

**¶16**        After a one-day hearing in March 2023, the juvenile court terminated Father's parental rights as to A.M. solely on the abandonment ground. Father timely appealed. We have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

**¶17**        A parent's right to custody and control of his or her child, though fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). The parental relationship may be terminated if the juvenile court finds, by clear and convincing evidence, at least one statutory ground for termination under A.R.S. § 8-533(B) and further finds, by a preponderance of the evidence, that termination is in the child's best interests. *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474, ¶ 13 (2022). We view evidence in the light most favorable to sustaining the juvenile court's findings, *see Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008), and we will affirm an order terminating parental rights absent an abuse of discretion, *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

**¶18**        Father does not challenge the juvenile court's determination that termination was in A.M.'s best interests. He argues, however, that the court's determination that he "abandoned" A.M. "is clearly erroneous and not supported by substantial evidence."

**¶19**        Abandonment occurs when a parent fails to "provide reasonable support and to maintain regular contact with the child, including providing normal supervision." A.R.S. § 8-531(1). To establish abandonment, the evidence must show that the parent has made only "minimal efforts to support and communicate with the child." *Id.* "Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment." *Id.* "[A]bandonment is measured not by a parent's subjective intent, but by the parent's conduct." *Michael J.*, 196 Ariz. at 249, ¶ 18. "What constitutes reasonable support, regular contact, and normal supervision varies from case to case." *Id.* at 250, ¶ 20 (citation omitted). "Therefore, questions of abandonment are questions of fact for resolution by the trial court." *Id.* (cleaned up).

**¶20**        Here, reasonable evidence supports the juvenile court's finding that Father abandoned A.M. As the court noted, after 2017 Father "failed to maintain regular contact with the child," "[t]he child received no cards or gifts from Father," and "Father did not inquire as to the child's

well-being." Although Father's sister contacted Mother about A.M. twice in 2019, efforts by Father's family members to contact the child are irrelevant to Mother's abandonment claim against Father. *See also Steven M. v. Dep't of Child Safety*, 254 Ariz. 426, 430 ¶ 12 (App. 2023) ("The burden to act as a parent rests with the parent . . . .") (citation omitted).

**¶21**　　Father's lengthy hospitalization following his accident in 2019 does not establish "just cause" for his absence from A.M.'s life, *see* A.R.S. § 8-531(1), because, at the time of Father's accident, he had not seen A.M. for two years and had only tried to contact her by phone once. When asked by counsel why he didn't "make more of an effort to see [his] daughter" during the two years before his accident, Father replied, "I—don't have [a] response for that one."

**¶22**　　Relying on *Calvin B. v. Brittany B.*, 232 Ariz. 292 (App. 2013), Father argues that Mother interfered with his relationship with A.M., thereby precluding a finding of abandonment. *See id.* at 293-94, ¶ 1 ("[A] parent who has persistently and substantially restricted the other parent's interaction with their child may not prove abandonment based on evidence that the other has had only limited involvement with the child."). According to Father, Mother "obstructed" his relationship with A.M. by (1) changing her telephone number without telling him; (2) refusing to bring A.M. to the hospital to visit him after his accident; (3) refusing gifts from his sister Susan in 2019; and (4) listing A.M.'s current residence as "protected" on the petition for termination despite there being "no evidence that [Father] was a threat to her or the child." Father further accuses Mother of "do[ing] all in her power to eliminate [Father] as the child's father and to replace him with her husband" despite knowing that Father is "limited in his ability to protect his parental relationship" due to his "catastrophic injury."

**¶23**　　*Calvin B.* is readily distinguishable. There, the mother "persistently and substantially restricted [the father's] interaction with their child," refusing to allow him to exercise his court-ordered parenting time (in violation of their dissolution decree), seeking an order of protection barring him from any contact with the child, and refusing to allow him to speak with the child on the phone for at least six months. *Id.* at 293, 297-98, ¶¶ 1, 21-24, 30. This Court held that, under those circumstances, the superior court erred by finding abandonment "given the hurdles that [the mother] erected to [father's] ability to parent." *Id.* at 297, ¶¶ 21, 25.

**¶24**　　Here, although Mother "changed her phone number in 2018," there is no evidence that Mother did so to prevent Father from contacting

her or A.M. Indeed, Father could have contacted them via social media and through A.M.'s maternal grandmother, whose phone number and address Father knew. Similarly, Father's contention that Mother interfered with his parent-child relationship by listing her address as "protected" on the termination petition she filed in 2022 overlooks both the alternative means of communication available to him and his failure to maintain a relationship with A.M. for over four years before Mother filed the petition.

¶25         Mother's unwillingness to bring A.M. to visit Father in the hospital in 2019 does not preclude a finding of abandonment in view of the amount of time that had passed since his last contact with the child in 2017 and Mother's explanation, which Father made no attempt to refute, that she feared that A.M. would suffer emotional harm if she saw Father in an injured condition. *See In re C.R. & A.R.*, 105 Ariz. Cases Dig. 34, ¶ 15 (App. Sept. 19, 2023) (noting that one parent's restriction of other parent's access to their child precludes a finding of abandonment "only if" the restriction was "wrongful[]") (emphasis omitted). Evidence in the record amply supports the court's determination that Mother's "actions do not rise to the level of interference required to establish a defense to abandonment."

¶26         In any case, even if Mother could be said to have interfered with Father's relationship with A.M., a parent "must act persistently" to foster and maintain the parent-child relationship despite obstacles that may arise. *See Michael J.*, 196 Ariz. at 250, ¶ 22. Irrespective of Mother's conduct, Father had an obligation to act persistently to maintain his relationship with A.M. and "vigorously assert his legal rights to the extent necessary." *See id.* (citation omitted). Father made no such efforts. From 2017 until his accident in 2019, he only visited A.M. once and called one other time. Although Mother changed her phone number in 2018, he still could have contacted her through his siblings or the maternal grandmother. He did not. Similarly, he could have sought parenting time in family court, but he did not. At bottom, despite a variety of ways in which Father could have nurtured and maintained his relationship with A.M., he made no effort to do so. Father's longstanding failure to diligently maintain his relationship with A.M. supports the juvenile court's finding of abandonment. *See In re C.R. & A.R.*, 105 Ariz. Cases Dig. at ¶¶ 16, 20, 22 (rejecting father's claim that mother interfered with his relationship with the children by failing to accept his phone calls because father "could have maintained his relationship with the children in a variety of [other] ways," including by writing them letters and petitioning for court-ordered parenting time, "but wholly failed to do so").

**CONCLUSION**

**¶27** Because ample evidence supports the juvenile court's finding of statutory grounds for termination and Father does not challenge the court's determination that termination was in A.M.'s best interests, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: TM