NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO E.W.

No. 1 CA-JV 23-0217
FILED 4-18-2024

Appeal from the Superior Court in Maricopa County
JD41967
The Honorable Melody Harmon, Judge

**AFFIRMED**

COUNSEL

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant Father*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee Department of Child Safety*

Maricopa County Office of the Legal Advocate, Phoenix
By Amanda L. Adams
*Counsel for Appellee E.W.*

---

**MEMORANDUM DECISION**

---

Presiding Judge Daniel J. Kiley delivered the decision of the Court, in which Judge Kent E. Cattani and Judge D. Steven Williams joined.

---

**K I L E Y,** Judge:

¶1        Vonnie W. ("Father") appeals the termination of his parental rights to his daughter E.W., asserting that termination was not in E.W.'s best interests. Because reasonable evidence supports the court's finding that termination would be in E.W.'s best interests, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        Father and Kiera B. ("Mother") lived together in New York until Mother, who was six months pregnant, relocated alone to Arizona to live with her mother ("Grandmother"). Mother gave birth to E.W. in June 2022.

¶3        Viewed in the "light most favorable to sustaining the juvenile court's order," *In re O.M.*, 254 Ariz. 543, 544, ¶ 3 (App. 2023), the evidence shows that E.W. was born exposed to methamphetamine, fentanyl, marijuana, and other substances. Having difficulty feeding and in need of morphine to treat her withdrawal symptoms, E.W. remained hospitalized for several weeks after her birth. Although Mother initially visited the child, she was banned from the hospital after she bit off E.W.'s feeding tube. Mother was immediately referred for drug testing; she tested positive for fentanyl, methamphetamine, heroin, and other substances.

¶4        Before E.W. was discharged, the Department of Child Safety ("DCS") filed a dependency petition in July 2022 and, after being unable to locate Father, placed E.W. in Grandmother's care.

¶5        DCS eventually contacted Father in New York and asked him to undergo paternity and substance abuse testing. Father refused to establish paternity, engage in services, or even provide his home address, expressing suspicion that DCS was trying to "set him up" by tricking him into disclosing his whereabouts so he could be arrested on an outstanding Arizona warrant.

¶6 The court found E.W. dependent in October 2022 and changed the case plan to severance and adoption in February 2023. In March 2023, DCS moved to terminate Father's parental rights on abandonment and out-of-home placement grounds.[1] *See* A.R.S. § 8-533(B)(1), (8). Later that month, Father finally agreed to undergo testing, which established paternity, and he then contested the petition to terminate his parental rights to E.W.

¶7 Despite DCS's requests, Father refused to engage in substance abuse testing or treatment. In June 2023, Father accepted DCS's offer of visitation. Unwilling to risk arrest on the outstanding warrant, however, he continued to refuse to travel to Arizona, and so his visits with E.W. took place virtually. Although each visit was scheduled for two hours, they typically ended much sooner, after around fifteen minutes. In one instance, his virtual visit with E.W. lasted only three minutes.

¶8 In July 2023, DCS learned that Father had moved to Alaska, where he had an open case with the Alaska Department of Child Safety regarding three other children he had with another woman. The Alaska agency informed DCS that it had recommended that Father undergo a mental health evaluation due to his history of emotional outbursts. DCS also learned that Father had previously been criminally charged for sending threatening text messages to the mother of his other children and to another woman.

¶9 DCS provided Father with contact information for various substance abuse assessment and treatment providers in Alaska, but Father never participated. He also refused DCS's request that he undergo a psychological evaluation, an anger management assessment, and a domestic violence assessment.

¶10 After a hearing in September 2023, the DCS case manager testified, among other things, that E.W. had been in Grandmother's care since she was discharged from the hospital after her birth, Grandmother had met all of her needs, and Grandmother wanted to adopt her.

¶11 Father appeared at the hearing remotely from his home in Alaska. He acknowledged that he had never met E.W. in person and that he had not participated in services requested by DCS. He nonetheless stated

---

[1] DCS also petitioned to terminate Mother's rights, which were subsequently terminated. Mother is not a party to this appeal.

that he loved E.W. and was willing to engage in services to improve his ability to parent her.

**¶12**        After the hearing, the court found that DCS established "a *prima facie* case of abandonment" under A.R.S. § 8-533(B)(1), which Father failed to rebut, and that Father "willfully refused to remedy the circumstances" that caused E.W. to be placed in Grandmother's care. *See* A.R.S. § 8-533(B)(8).

**¶13**        Finding that Father "gave no indication of when he would ever be able and willing to parent" E.W., the court also determined that termination was in E.W.'s best interests. The court found that maintaining Father's parent-child relationship with E.W. would be detrimental to E.W. by leaving her "indefinitely in foster care" and denying her "the permanency she deserves." Grandmother's adoption of E.W., the court concluded, would provide E.W. with stability and permanency in the "loving and nurturing home environment" where she had thrived since she was born.

**¶14**        Father timely appealed, and we have jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

**¶15**        A parent's right to the custody and control of his child, though fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). The parental relationship may be terminated if the court finds, by clear and convincing evidence, at least one statutory ground for termination under A.R.S. § 8-533(B) and further finds, by a preponderance of the evidence, that termination is in a child's best interests. *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474, ¶ 13 (2022). In determining a child's best interests, a court "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148, ¶ 1 (2018).

**¶16**        We view evidence in the light most favorable to sustaining the juvenile court's findings, *see Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008), and we will affirm an order terminating parental rights absent an abuse of discretion, *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). We "accept the juvenile court's findings of fact if reasonable evidence and inferences support them," *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3, ¶ 9 (2016), and we will affirm the court's legal

conclusions unless clearly erroneous, *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478-79, ¶ 31 (2023).

**¶17** Father does not challenge the statutory grounds for termination under A.R.S. § 8-533(B)(1) and (8). Instead, he argues only that the court abused its discretion by finding that termination was in E.W.'s best interests. He asserts that E.W.'s best interests would have been served by establishing a guardianship in lieu of termination, which would have allowed her to maintain her relationship with "a father who loves her."

**¶18** Under A.R.S. § 8-872(A), "[a]ny party to a dependency proceeding . . . may file a motion for permanent guardianship." A guardianship may be established if it is in the child's best interests; the child has been adjudicated dependent and has been in the custody of the prospective guardian for at least nine months; further reunification efforts, if applicable, would be unproductive; and termination of parental rights would not be in the child's best interests. A.R.S. § 8-871(A).

**¶19** But Father never moved to establish a guardianship under A.R.S. § 8-872(A) or request a case plan of guardianship. And no other party did either. The juvenile court thus lacked authority to establish a guardianship for E.W. *See Ariz. Dep't of Econ. Sec. v. Stanford*, 234 Ariz. 477, 480, ¶ 14 (App. 2014) (holding that juvenile court cannot initiate a guardianship "in the absence of a statutorily compliant motion by a party to the proceedings").

**¶20** Father also argues that termination cost E.W. "vital relationships" with her extended family, such as her three half-brothers and her paternal grandmother. But nothing in the record suggests that E.W. ever had any kind of relationship with Father's other children or her paternal grandmother. And there is no evidence that Grandmother would prevent Father's extended family members from establishing a relationship with E.W. if they ever expressed an interest in doing so.

**¶21** In determining that termination was in E.W.'s best interests, the juvenile court cited, *inter alia*, Father's "lack of effort toward reunification." Although Father now claims he is "willing to continue the steps necessary to be a part of [E.W.'s] life," the record amply supports the court's finding that Father "did not make an effort to . . . engage in services towards reunification."

**¶22** Father never came to Arizona to spend time with E.W. He did not begin virtual visits until three months before the termination hearing, and his virtual visits with the child lasted only a fraction of the allotted time.

From the outset of these proceedings, DCS urged Father to participate in various services, including substance abuse treatment and anger management, but he repeatedly refused.

**¶23**      DCS's Progress Report from July 2023 states that even after Father expressed a willingness to engage in services, he exhibited a "pattern of non-engagement, avoidance, and being resistant to change." The report's statements about Father's non-engagement and avoidance are corroborated by Father's own testimony. When asked at the hearing if he had undergone the recommended psychological evaluation, he admitted that he had not, stating, "I'm scheduled to do that next week." Waiting until after the termination hearing to schedule a service that DCS requested months earlier illustrates his lack of commitment to improving his ability to parent the child. *See Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994) (affirming termination and determining that parent's "successful efforts at rehabilitation in the eight months prior to the severance hearing[,] . . . while commendable, were 'too little, too late'").

**¶24**      Father did not claim to have followed DCS's recommendation that he participate in anger management treatment, and evidence presented at the termination hearing made clear that his anger issues persist. The DCS case manager testified that Father had "outbursts" during some of their phone conversations. She described one conversation in May 2023, roughly four months before the hearing, when Father was "very upset and agitated" because he believed that she was "talking about him behind his back." During this conversation, Father warned the case manager that he might "have one of his boys pay [her] a visit."

**¶25**      In his testimony, Father did not unequivocally deny threatening the case manager, saying only that he does not "remember ever" doing so. Moreover, he admitted having "emotional outbursts" during their phone conversations for which he neither apologized nor acknowledged fault. On the contrary, he insisted that it was "my right . . . to speak upon how I was feeling."

**¶26**      Termination is in a child's best interests if the child "would derive an affirmative benefit from termination or incur a detriment" by maintaining the parent-child relationship. *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 6 (App. 2004). The court's finding that the child would benefit from termination because she could be adopted by the person who has cared for her and met her needs for her entire life supports the court's "best interests" determination. *See Maricopa Cnty. Juv. Action No. JS-8441*, 175 Ariz. 463, 469 (App. 1993) ("The benefit of severance to the

child is that which the legislature intended: freedom to be adopted into a stable and nurturing home."). So, too, does the court's finding that denying termination would be detrimental to E.W. by "leaving [her] indefinitely in foster care" because Father has made little effort to engage in services to enable him to parent her. *See JS-501568*, 177 Ariz. at 577 (concluding that "[l]eaving the window of opportunity for remediation open indefinitely" is not in the child's best interests). We therefore affirm the court's termination of Father's parental rights.

**CONCLUSION**

¶27       For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA