NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO A.L.

No. 1 CA-JV 24-0046

FILED 07-23-2024

---

Appeal from the Superior Court in Maricopa County
No. JD32132
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

---

COUNSEL

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant*

John L. Popilek PC, Scottsdale
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Thomas K. Sanders
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

---

Judge Andrew M. Jacobs delivered the decision of the Court, in which Presiding Judge Maria Elena Cruz and Judge Samuel A. Thumma joined.

---

**J A C O B S**, Judge:

¶1   Angel L. ("Father") and Extacy T. ("Mother") appeal an order terminating their parental rights to their biological child, Alexis (a pseudonym). We affirm.

## FACTS AND PROCEDURAL HISTORY

### A. The Parents' Substance-Abuse Problems Lead the Court to Terminate Their Parental Rights to Alexis' Siblings.

¶2   Mother is the biological parent of five children—Carlos (age 11), Reyna (age 9), Francis (age 8), Junior (age 3), and Alexis (age 2) (all pseudonyms). Father is the biological parent of both Junior and Alexis.

¶3   Mother and Father have a long history with the Department of Child Safety ("DCS"). In 2016, DCS took custody of Carlos, Reyna, and Francis because Mother was neglecting them and abusing drugs. The court terminated Mother's parental rights to these children in 2018 for those reasons.

¶4   In 2020, Mother gave birth to Junior, who was born substance-exposed. Because Mother and Father were abusing drugs, DCS removed Junior from their care, placed him in a foster home and filed a dependency petition. The superior court later adjudicated Junior dependent as to the parents and adopted a family reunification case plan.

¶5   In that dependency, DCS provided the parents with substance-abuse assessments and treatment, drug testing, mental-health services, parenting education, and visitation. Mother stopped participating in these services in October 2021 and Father stopped participating in December 2021.

¶6   At a report and review/permanency planning hearing in January 2022, the court changed the case plan to severance and adoption. After the parents failed to appear at an initial severance hearing in March

2022, the superior court terminated their parental rights as to Junior because of their unaddressed substance-abuse issues. Father appealed the court's termination order, which we affirmed. *See Angel L. v. Dep't of Child Safety*, 1 CA-JV 22-0097, 2022 WL 4243833 at *1 ¶ 1 (Ariz. App. Sept. 15, 2022) (mem. decision).

**B.      The Parents Were Arrested on Drug Charges and Alexis Was Born Substance-Exposed.**

**¶7**          Meanwhile, on January 8, 2022, the police stopped the parents in their car because Father had outstanding warrants. The police searched the car and found fentanyl pills, marijuana, and a gun. The police arrested the parents, who were charged with possession of narcotic drugs for sale, possession of marijuana for sale, possession of a weapon by a prohibited possessor (Father), and the use of a weapon in a drug offense.

**¶8**          Two weeks later, Alexis was born premature and substance-exposed. Mother left the hospital against medical advice a day later. Alexis, who weighed about 3 pounds at birth, remained in the hospital for about two months.

**¶9**          After leaving the hospital, Mother visited Alexis sporadically for 11 days. She also called the hospital to check on Alexis for about three weeks. Although Father was present for Alexis' birth, he visited her once in the hospital. Hospital staff also attempted to contact the parents several times during the week before Alexis was discharged, but the parents did not respond because they had changed their phone numbers without providing the new numbers to the hospital or DCS.

**C.      The Court Declared Alexis Dependent as to Mother and Father, Who Then Fail to Participate in DCS Services.**

**¶10**          DCS took custody of Alexis when she was being discharged from the hospital in March 2022 and placed her in the same foster home as her brother, Junior. DCS also filed a dependency petition as to Alexis based on the parents' substance abuse and the recent termination of their parental rights to Junior. The superior court adjudicated Alexis dependent as to Mother in June 2022 and adopted a severance and adoption case plan. In September, the court adjudicated Alexis dependent as to Father, and determined that the appropriate case plan was family reunification.

**¶11**          In June 2022, DCS moved to be relieved from providing services to the parents because the parents had not participated in substance-abuse treatment during Junior's dependency. The superior court

denied the motion, and as a result DCS referred the parents to substance-abuse testing and assessment, the Nurturing Parenting Program ("NPP"), and supervised visitation. The DCS case manager attempted to engage the parents in these services. But Mother's phone number was out of service, and she did not respond to the case manager's email. Mother also made no independent effort to communicate with DCS or see Alexis for the first ten months of the dependency case.

¶12 The case manager contacted Father in July 2022 and provided him with a letter outlining his services. She also held a Team Decision Meeting ("TDM") later that month to set up Father's supervised visits with Alexis. DCS also arranged for Father to visit with Alexis after that meeting. Father, however, missed his next four visits with Alexis, and the service provider closed his referral for supervised visits a month later.

¶13 In September 2022, DCS again referred Father for supervised visits. DCS also referred Father to the NPP, which would have given Father hands-on parenting education and an opportunity to practice parenting skills while with Alexis. When the case manager spoke to Father in November 2022, she told him that the NPP and the visitation coordinator were trying to reach him. Father denied missing any calls from service providers, but also reported he had recently changed his phone number. The case manager emphasized how important it was that he answer his phone and return calls from these service providers. She also provided his new telephone number to the NPP staff and the visitation coordinator. The providers, however, were still unable to reach him after that meeting, and they closed his referrals once again.

¶14 Parents have been in custody continuously from their arrest on January 8, 2023. Mother pled guilty to a reduced charge and was sentenced in January 2023, with an expected release date in October 2024. Father pled guilty to a reduced charge and was sentenced in March 2023, and his expected release date is in April 2026. After learning of their incarceration, the case manager sent them service letters and encouraged them to participate in any services available to them in prison.

### D.     The Court Terminated the Parents' Rights to Alexis.

¶15 In August 2023, after the court changed the case plan to severance and adoption, DCS moved to terminate the parents' rights to Alexis. Mother then moved the superior court to appoint her father as Alexis' permanent guardian. After a one-day trial in January 2024, the court denied Mother's guardianship motion and granted DCS's motion to

terminate based on A.R.S. § 8-533(B)(8) (fifteen-months out-of-home placement) and A.R.S. § 8-533(10) (prior termination within 24 months on the same grounds). The court found DCS made diligent efforts to reunify the family by providing a variety of services. The court also found the parents were unable to remedy the circumstances that caused the out-of-home placement, noting their failure to engage in substance-abuse services, and that they would "not be capable of exercising proper and effective parental care and control in the near future." Finally, the court found that terminating the parents' rights as to Alexis was in her best interests.

¶16 The parents timely appealed the termination order. We have jurisdiction. A.R.S. §§ 8-235(A), 12-120.21(A), 12-2101(A); Ariz. R.P. Juv. Ct. 601(a).

## DISCUSSION

¶17 A parent's right to custody and control of his or her own child, while fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248 ¶¶ 11–12 (2000). The superior court may terminate the parental relationship where (1) clear and convincing evidence shows the existence of a statutory ground for termination under A.R.S. § 8-533, and (2) a preponderance of the evidence shows that termination is in the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 281–82, 288 ¶¶ 7, 41 (2005).

¶18 We accept the superior court's factual findings so long as they are supported by reasonable evidence and inferences, and we affirm the superior court's legal conclusions about the statutory grounds for termination unless they are clearly erroneous. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478-79 ¶¶ 30-31 (2023). We will not disturb the court's conclusion regarding statutory grounds for termination unless we determine that "as a matter of law [] no one could reasonably find the evidence to be clear and convincing." *Id.* at 478 ¶ 31 (internal citations omitted). We do not reweigh the evidence. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47 ¶ 8 (App. 2004).

¶19 Focusing on the time-in-care ground, the court was required to find that: (1) Alexis had been in an out-of-home placement for a cumulative total period of at least fifteen months; (2) DCS had made a diligent effort to provide appropriate reunification services; (3) the parents have been unable to remedy the circumstances that caused Alexis to be in an out-of-home placement; and (4) there is a substantial likelihood that the

parents will not be capable of exercising proper and effective parental care and control in the near future. A.R.S. § 8-533(B)(8)(c).

**¶20** On appeal, Father challenges only the superior court's conclusion DCS proved the second element of this statutory ground. Mother only challenges the court's conclusions about the third and fourth elements. By not appealing it, the parents concede the correctness of the court's findings on the other elements as well as that terminating their parental rights was in Alexis' best interests, which the appellate record supports. *See Michael J.*, 196 Ariz. at 249 ¶ 13.

## I. Father Did Not Waive His Argument That DCS Failed to Diligently Provide Him with Appropriate Reunification Services.

**¶21** DCS argues that Father waived his challenge to the adequacy of its reunification efforts by not raising the issue before his termination trial. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178-79 ¶ 16 (App. 2014) (when a parent fails to raise DCS's diligence in providing reunification services in the superior court, he or she waives it).

**¶22** DCS's argument fails because Father raised concerns with his video visits during (1) the report and review hearing in July 2023, (2) the initial severance hearing in October 2023, and (3) the pre-trial hearing in November 2023. He also raised this issue while testifying at the termination trial and in his closing argument. By expressly raising these concerns, he did not waive them.

## II. The Record Supports the Order's Conclusion That DCS Diligently Provided the Required Reunification Services.

**¶23** As an initial matter, DCS argues it was not required to make a diligent effort to provide reunification services under the prior-termination ground. This argument lacks merit. *See Mary Lou C.*, 207 Ariz. at 49 ¶ 15 (holding that DCS is required to make reasonable efforts to preserve the family under the prior-termination ground); *Tanya K. v. Dep't of Child Safety*, 240 Ariz. 154, 157 ¶ 11 (App. 2016) (same). We thus consider whether there is reasonable support in this record for the conclusion that DCS fulfilled this requirement. As we next explain, it did.

**¶24** Father argues the superior court's conclusion that DCS made diligent efforts to provide appropriate reunification services was error because DCS substantially failed to provide him with visitation while he was incarcerated. He relies on *Jessie D. v. Dep't of Child Safety* to argue that DCS must make diligent efforts to preserve the family by providing

services—particularly visits—to assist parents in maintaining a bond with their children "[b]ecause parents incarcerated for a lengthy period still possess a fundamental liberty interest in the care, custody, and management of their children . . . ." 251 Ariz. 574, 581–82 ¶ 20 (2021).

¶25 The record supports the superior court's finding of diligent efforts. Before Father was incarcerated, DCS offered services including drug testing, supervised visits, and the NPP. DCS arranged for Father to have supervised visits at the TDM in July 2022, but Father missed four consecutive visits, which caused the referral to close. DCS's referral for the NPP closed after Father failed to contact it. When asked why he was not visiting Alexis before his incarceration, Father explained that he was probably "just running around in the streets or something, [he] wasn't really doing what [he] was supposed to be doing." Father thus had only two visits with Alexis before his incarceration in January 2023—once while she was intubated in the hospital and once after the TDM in July 2022.

¶26 The record supports the superior court's finding that, after incarceration, DCS attempted to arrange virtual visits between Father and Alexis even though he "had no parental relationship with his daughter prior to his incarceration." Father was transferred from the jail to prison in March 2023. After the report and review hearing in April 2023, DCS reported it would arrange for Mother and Father to have virtual visits with Alexis. The case manager later testified that it was hard to set up visits through Father's corrections officer because it was difficult to reach someone at the prison to speak with. At a review hearing in August 2023, Father's counsel reported similar communication problems. Despite these difficulties, DCS arranged for Father to have twice-monthly virtual visits beginning on July 21, 2023.

¶27 Father acknowledged at trial that he had video visits in prison with Alexis, but "[j]ust like three times." The record shows visits that did not occur were cancelled for reasons not ascribable to any lack of diligence by DCS, including: (1) one visit being cancelled because Alexis was sick; (2) two missed visits because the case manager could not log into the prison's video conferencing system; (3) Father missing a visit to appear at the termination trial; and (4) Father choosing not to attend at least one visit. The record reasonably supports the superior court's implicit conclusion that Father's incarceration, and not DCS, created any inconsistency in visits.

¶28 For these reasons, the superior court did not err in concluding that DCS made diligent efforts to reunify Father with Alexis. Because we affirm the termination order based on the out-of-home placement ground,

we do not address the prior-termination ground, A.R.S. § 8-533(B)(10). *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 3 (App. 2002).

### III.   The Record Supports the Order Terminating Mother's Parental Rights.

**¶29**          Mother argues the superior court erred when it concluded she had failed to remedy her substance-abuse problem because she was sober for over a year before the termination trial.   In the order terminating Mother's rights, the court found Mother's substance abuse "spanned at least half a decade" and led to Alexis being substance-exposed in utero. The court also found that DCS provided Mother with services that focused on addressing her substance abuse problem, but that Mother had refused to communicate with DCS, failed to participate in substance-abuse services at Terros, failed to drug test, and had no parental relationship with Alexis before her incarceration in January 2023.

**¶30**          Record evidence supports these findings.   Mother testified that she did not visit Alexis before her incarceration.  She testified that her only participation in substance abuse treatment prior to her incarceration was to complete an intake appointment at Terros.  Mother also testified that she did not think she drug tested at all during Alexis' dependency case. Indeed, before Mother's incarceration, she had not drug tested since September 2021, and that test was positive for THC and methadone.

**¶31**          Mother relies on our unpublished decision, *Shaquita H. v. Dep't of Child Safety*, 1 CA-JV 19-0209, 1 CA-JV 19-0218 (consolidated), 2019 WL 6875292 (Ariz. App. Dec. 17, 2019) (mem. decision), to argue that the superior court's finding that she failed to remedy her substance-abuse issues was error because the evidence established that she had been sober for more than a year.  But *Shaquita H.* is not persuasive.  In that case, the mother was incarcerated for violating her probation shortly after her child's birth and remained incarcerated for four months. *Id.* at *1 ¶ 5. During those four months she completed as 12-step recovery program. *Id.* at *1 ¶ 6.  And by the time of her termination trial, she was out of custody, had contacted DCS to arrange for reunification services, had scheduled an intake with Terros, and had begun to drug test. *Id.* at *3 ¶ 14.  On that very different record, we agreed with the mother that DCS failed to prove by clear and convincing evidence that she was unable to discharge her parental responsibilities due to chronic substance abuse at the time of trial. *Id.* at *2 ¶ 11.

**¶32** By contrast, Mother was incarcerated at the time of her termination trial. And after more than a year in prison, she had not yet completed a substance abuse program and had only attended 11 Narcotics Anonymous group sessions. Moreover, to successfully parent, Mother must be able to discharge her parental responsibilities when she is not in custody. The court recognized this in finding that Mother "has not been successful in maintaining her sobriety outside a confined setting." That finding is further supported by Mother's testimony that her sobriety was due to the supports she had in prison:

> Q [ . . . ] Why didn't you choose not to do drugs from the time period of the child was born until you were incarcerated?
>
> A I wish I could answer that to you for myself, but I can't because, I don't know, I was weak and, like, I didn't have the type of things I have here.

*See also Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 378 ¶ 25 (App. 2010) (stating that when a parent has been unable "to experience sustained sobriety in a noncustodial setting, and establish the essential support system to maintain sobriety, there is little hope of success in parenting.").

**¶33** Mother has not shown that the superior court erred in concluding DCS proved by clear and convincing evidence that Mother had been "unable to remedy the circumstances that caused the out-of-home placement and that there is a substantial likelihood [Mother] will not be capable of exercising parental care and control in the near future." *See* A.R.S. § 8-533(B)(8)(c). Because we affirm the superior court's order under A.R.S. § 8-533(B)(8)(c), we do not consider the prior-termination ground. *Jesus M.*, 203 Ariz. at 280 ¶ 3.

## CONCLUSION

**¶34** For the foregoing reasons, we affirm.

