NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO L.B. and C.B.,

No. 1 CA-JV 25-0018

FILED 10-22-2025

---

Appeal from the Superior Court in Maricopa County
No. JD35379
The Honorable Gregory S. Como, Judge

**AFFIRMED**

---

COUNSEL

Law Office of H. Clark Jones, Mesa
By H. Clark Jones
*Counsel for Appellant Father*

Elizabeth B., Peoria
*Appellant Mother*

Law Office of Ed Johnson, Phoenix
By Edward D. Johnson
*Advisory Counsel for Appellant Mother*

Arizona Attorney General's Office, Mesa
By Ingeet P. Pandya
*Counsel for Appellee Department of Child Safety*

Maricopa County Office of the Legal Advocate, Phoenix
By Amanda L. Adams
*Counsel for Appellees L.B. and C.B.*

---

## MEMORANDUM DECISION

Judge Daniel J. Kiley delivered the decision of the Court, in which Presiding Judge Angela K. Paton and Judge Brian Y. Furuya joined.

---

**K I L E Y**, Judge:

¶1        Robert B. ("Father") and Elizabeth B. ("Mother") appeal the superior court's order terminating their parental rights to the two children they share. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2        Mother gave birth to the parties' first child, C.B., in April 2021. The parties married a little over a year later.

¶3        The month after C.B. was born, the Department of Child Safety ("DCS") received a report that the police had been called to the parties' home after an altercation in which Mother resisted Father's attempts to forcibly take the baby from her arms, resulting in a physical "tug-of-war" over her. After pulling C.B. from Mother's arms, Father took the baby from the home and went to a neighbor's house. The Phoenix Police Department conducted a welfare check at the neighbor's house but took no further action.

¶4        DCS filed a dependency petition in June 2021, alleging that neither parent was able or willing to provide two-month-old C.B. with proper and effective parental care "due to domestic violence and mental health concerns."

¶5        The juvenile court initially ordered that C.B. be left in Mother's care pending the dependency hearing, subject to a "safety plan" that required Mother to live with her sister, C.B.'s maternal aunt M.V. ("Aunt"). Within a week, however, Mother violated the safety plan by leaving Aunt's house with C.B. and returning to live with Father. The court then ordered C.B. removed from Mother's custody and placed in Aunt's care.

¶6        The juvenile court subsequently found C.B. dependent as to Mother and Father. The initial case plan was family reunification, and DCS offered Mother and Father services to help them remedy the circumstances

that led to the child's removal. Initially, DCS requested that both Mother and Father undergo a psychological evaluation, referred them to Family Connections and the Nurturing Parenting Program ("NPP") for parenting classes and coaching, and helped set up supervised visits with C.B.

¶7            As requested, both parents underwent psychological evaluations. Father's evaluation was conducted by Roger Martig, Ph.D., who determined that Father suffered from "trauma" resulting from the time he spent in DCS custody as a child and from physical confrontations he had with a stepparent during his teenage years. Dr. Martig concluded that Father suffers from "depression and anxiety" which "may . . . be related to" his "tendenc[y] to be . . . perhaps overly angry on occasion." Noting that Father "may lack insight into his own problems," Dr. Martig recommended that Father participate in "supportive therapy . . . combined with cognitive behavioral therapy."

¶8            Although Mother's psychological evaluation is not in the record, she later testified that she was diagnosed with "bipolar schizophrenia."

¶9            Over the next year, both parents participated in various services. Father, for example, participated in individual therapy through Neighborhood Outreach Access to Health ("NOAH") to "address[] his childhood trauma and how it relates to his parenting." Additionally, both parents participated in parenting classes and engaged in supervised visits with C.B.

¶10            Despite their engagement in services, however, DCS observed that "very little [*sic*] behavioral changes ha[d] occurred." Father's therapist through NOAH "reported that [he] minimize[d] the on-going domestic violence occurring between him and [Mother]." Multiple scheduled visits were cut short or cancelled altogether because Father did not arrive on time. Visitation supervisors reported that Father was "very difficult to work with, and . . . quickly bec[a]me irate to staff." His visitation was temporarily suspended after an incident when he arrived for a visit with a marijuana vape cartridge in his pocket and became "argumentative" with security when told he could not bring it inside the facility.

¶11            Similarly, during supervised visits, Mother was observed "looking" at "her phone" rather than "focus[ing] on [C.B.]." Further, Mother's NPP referral was closed after six weeks because the provider determined she was "unable to comprehend, discuss, or focus during … attempts to teach and complete" the parenting coursework and she failed to complete home assignments, claiming to be "too busy."

¶12        During this same time, both parents struggled with employment and housing stability. From the start of the dependency proceedings in June 2021 until February 2023, Mother worked at various restaurants and at what she later called "temp" jobs. In February 2023 she obtained a job at a Denny's restaurant working 30 hours per week; she held that job for less than a year. A few months into the dependency, Father lost his job at a pizza restaurant because, he claimed, he missed too much work attending DCS appointments. In early 2022, he obtained a job at a different pizza restaurant, but by early 2023 he was unemployed again. Meanwhile, according to Mother, the two of them "d[idn't] have a place" and were "staying with [Father's] friend."

¶13        In August 2022, Mother and Father had another child, L.B. Due to the unresolved issues in C.B.'s dependency, DCS immediately filed a dependency petition for L.B. Both parents pled no contest to the allegations in the dependency petition, and L.B. was adjudicated dependent and placed with Aunt.

¶14        Following the birth of L.B., both parents continued participating in individual therapy. Father began weekly drug testing, often testing positive for marijuana. Father's supervised visitation was resumed, and Father continued to exhibit concerning behavior. Visitation supervisors reported that Father would "often yell." Moreover, Father was resistant to guidance. On one occasion, he left L.B. "alone on [a] couch" while the baby was sleeping. When the case aide pointed out the safety risk to the baby, Father "argue[d]" with the aide "instead of fixing the concern." On another occasion when changing L.B.'s diaper, Father wiped the baby's genitals so roughly that L.B. had to be taken to urgent care due to injuries to his penis "that looked like rug [burn]."

¶15        Mother was re-referred to NPP. Although she successfully completed the program this time, it was recommended that she be re-referred another time because "she continue[d] to struggle greatly with parenting the children[.]" Father was also referred to NPP and, after being unsuccessfully closed out, was re-referred again.

¶16        In October 2022, Father and Mother requested couple's counseling through NOAH. Later that same week, however, police were called to the parents' home twice on the same day because Father and Mother were engaged in heated arguments. The second time, Glendale police officers arrested Mother for disorderly conduct. When NOAH called the following day to schedule their initial couple's counseling session, Father informed them that Mother "went to jail last night" and that couple's

counseling was "no longer need[ed]" because he intended to "get[] an annulment."

¶17 In July 2023, Father underwent another psychological evaluation, this time by Nicole Mirkin, PsyD. After reviewing records, interviewing Father, and administering certain tests, Dr. Mirkin found cause for concern in Father's "recurring aggression and reluctance to change." Specifically, she determined that Father's "limited" progress and "his consistent denial of inappropriate actions[,] coupled with aggressive behavior," including "raising his voice" and "name-calling," "creates an unsafe environment for the children and hampers positive change." Dr. Mirkin opined that Father's prognosis for being "able to demonstrate" even "minimally adequate parenting skills in the foreseeable future" was "unfavorable[.]"

¶18 In August 2023, the court, at DCS's request, ordered that the parents be enrolled in the Cradle 2 Crayons ("C2C") program, a parenting services program operated by the superior court rather than DCS.

¶19 Father and Mother began participating in services through the C2C program in September 2023. They participated, for example, in "Family Time Coaching," a service that provides parenting coaches to parents during four-hour supervised visits. Likewise, they were enrolled in the "Circle of Security" program, which offers a curriculum to help parents better understand the needs of their children. Father also received individual trauma therapy, and Mother received child-parent psychotherapy to strengthen her bond with L.B.

¶20 In October 2023, counsel for the children moved to change the case plan from family reunification to severance and adoption. After an evidentiary hearing in December 2023, the court denied the request, determining that although the parents were "certainly not ready to have the children returned to them," terminating the relationship would be "premature."

¶21 The parents continued to participate in C2C programs, and the C2C providers reported that both parents made progress addressing some areas of concern. Father, for instance, became better able to recognize when he was becoming "upset," and would leave the visitation room for a five-minute break to calm himself. Mother, for her part, exhibited greater patience and affection with the children. The parents did not, however, meet all of their goals necessary to be considered safe and effective parents. On one occasion, for example, a parenting coach observed Father "holding [C.B.] a little tightly" when the child resisted being put down for a nap.

¶22            Meanwhile, both parents continued to be unable to maintain consistent employment. After a period of unemployment, Mother obtained a job in April 2024 working one day a week at a pizza restaurant. By the middle of the following month, however, she was unemployed again. Father worked a string of part-time fast-food jobs, which were punctuated by periods of unemployment.

¶23            The parents likewise were unable to maintain stable housing. In early 2024, after residing in a room at a Budget Suites of America motel at the maternal grandfather's expense, Father and Mother moved into a trailer owned by the maternal grandfather. Although the maternal grandfather expected them to pay rent each month, they did not consistently do so. As the maternal grandfather later testified, they lived in the trailer for six or seven months, but only paid rent for two. When, he further testified, he finally told them to vacate the premises in May 2024, Father "got upset" and began "screaming" at him and "cussing [him] out." Father then threw a lawn chair and went into the trailer and punched the refrigerator, breaking his hand. Alarmed at Father's reaction, the maternal grandfather called the police, then later sought legal assistance to have a notice of eviction prepared and served.

¶24            Upon being evicted, Father and Mother asked J.L., a neighbor in the trailer park, if "they could stay a night." J.L. agreed. As he later testified, however, Father and Mother did not depart the following day, but proceeded "to make themselves . . . at home" in his trailer without paying rent. J.L. further testified that, during the time that Father and Mother lived with him, Father "was angry all the time." At times, J.L. said, Father would "flip out and call [Mother] a bitch or a whore." At other times, he went on, Father would "beat[]" and "punch[]" his dog.

¶25            In August 2024, counsel for the children again requested a change in case plan to severance and adoption. Counsel for the children expressed concern that despite the parents' engagement with services, they were still not ready to parent the children full-time. Counsel also pointed out that the parents admitted that their current living situation was unsuitable for children, and that Father had not provided proof of employment despite repeated requests. Over the parents' objections, the court granted the request and changed the case plan to severance and adoption. Counsel for the children then moved to terminate Father's and Mother's parental rights under A.R.S. § 8-533(B)(8)(c).

¶26            After the case plan changed, J.L. overheard Father tell Mother that "he was going to blow up" the DCS building, "kill the kids' lawyer"

and "the judge that takes his kids away," and then "take his kids and . . . run from the country."

**¶27**        J.L.'s mother, who owned the trailer in which J.L. lived, told Father and Mother to move out. Father responded by becoming "verbally abusive" to her and then "ripp[ing] the shower head off the wall." J.L. called the police, and later he and his mother sought and obtained an injunction against harassment against Father.

**¶28**        After Father and Mother were required to move out of J.L.'s trailer, Mother moved in with her father. Although Father apologized for his May 2024 outburst and asked if he could move in, too, the maternal grandfather refused.

**¶29**        A termination trial was set for late December 2024. About a month or so before trial, DCS learned of the threat that J.L. heard Father make against DCS and court personnel. After an evidentiary hearing at which J.L. testified, the court found him "quite credible" and determined that Father's threats of violence warranted the suspension of Father's visitation and other in-person services. The court also allowed DCS representatives to testify virtually at the upcoming trial due to the threats made specifically against them by Father.

**¶30**        The five-day termination trial began in late December 2024. At the trial, counsel for C.B. and L.B. called DCS case manager Courtney Small and the children's maternal grandfather as witnesses. Small, who had been the case manager since mid-2022, gave an extensive overview of DCS's involvement in the case, the parents' involvement with services, and the parents' progress (or lack thereof) towards remedying barriers to reunification. Small testified, for example, that Father "is not able to control himself" under stress and, instead, "continues" to exhibit "emotional outbursts" and "dysregulation." Additionally, she stated, Father has not demonstrated stability in housing or employment. Over the course of the case, for example, he held multiple jobs at different fast-food restaurants.

**¶31**        Small further testified that the children are bonded with Aunt and her husband, that the children's needs are being met, and that Aunt and her husband want to adopt them.

**¶32**        The maternal grandfather testified about the financial support he had provided Father and Mother, their occupancy of his trailer, and Father's violent reaction when told to move out. He further testified that he will not allow Father into his home because Father "transforms into a different person" when he becomes angry. When asked if he would be

concerned for the well-being of C.B. and L.B. if they were returned to Father's custody, the maternal grandfather replied, "I cannot imagine my grandkids being with [him] for a week or a day." He also stated that although Mother was "trying as much as she can," he did not believe that she was "100 percent ready [to] get the kids with her."

¶33        The court also took judicial notice of J.L.'s testimony at the evidentiary hearing about Father's threats against DCS and court personnel and about Father's use of vulgar and insulting language when speaking with Mother.

¶34        Mother testified on her own behalf, stating that she has successfully addressed her mental health issues through medication and therapy and that she has obtained stable employment at a store working about 25 hours per week.

¶35        Mother also called child-parent psychotherapist, Sydnie Saunders, to testify. Saunders testified that she provided therapy to Mother and L.B. to "strengthen[] the attachment relationship," and that, in her opinion, Mother's ability to understand L.B.'s emotional and physical needs improved. Saunders acknowledged, however, that her observations were limited to "the hour a week" that she spends with Mother and L.B., and she couldn't opine on Mother's ability to parent outside a clinical setting.

¶36        Mother also called C2C's clinical director, Nicole Roskens, to testify. Roskens testified that both parents exhibited improved parenting skills during their weekly four-hour coaching sessions. She acknowledged that Father attended only 14 of the 24 scheduled therapy sessions, but nonetheless believed that he "was making progress" with his "reactions" to stress. Roskens explained that when Father found himself "getting stressed" during his visitation sessions, he would "ask to take a break" so he could leave the room for five minutes to calm himself. Roskens acknowledged, however, that parenting a child during supervised visits "in a controlled setting" with the "constant support" of a parenting coach is "not at all similar" to parenting a child on a full-time basis at home without "therapists on standby." She also acknowledged that a parent's display of "extreme anger" can have "negative effects" on young children.[1]

¶37        Father testified on his own behalf. He stated that he found the C2C programs and therapy helpful, and believed he had "made a lot of

_____

[1] Because Roskens testified that she did not have safety concerns regarding Father, the court reinstated Father's ability to receive C2C services in person.

strides" in mastering his anger issues. He further testified that he and the children have a loving relationship and that he was "ready" to parent them.

¶38        Father denied making the threats to which J.L. had testified and, although he admitted having an altercation with the maternal grandfather in May 2024, he blamed it on the maternal grandfather. According to Father, the maternal grandfather instigated the altercation by "cussing at me" and "hitting me with his cane." He admitted throwing a lawn chair during this incident, but insisted he did not throw it in the maternal grandfather's direction. He further admitted punching the refrigerator and breaking his hand, but appeared to suggest that it was an accident. "[I]n the heat of the moment," he stated, "I swung in the air and I ended up hitting my fridge."

¶39        Father admitted that he lacked stable housing during the dependency, but asserted that he remedied that issue by leasing an apartment with Mother "a couple of weeks" earlier. He further testified that he worked part-time at a pizza restaurant and was about to start a new job "making $15 an hour" cleaning airplanes at the airport "30 hours a week, possibly." He admitted, however, that he had not yet passed the background check required by his new employer. He acknowledged that he had not maintained stable employment during the dependency proceedings, but blamed his repeated job losses on DCS, asserting that the obligations that DCS imposed on him occupied so much of his time that his availability to work was unduly limited.

¶40        On further questioning, Father admitted that he had lost jobs during the dependency proceedings through no fault of DCS's. He testified, for example, that he lost his job at a KFC restaurant because he was unable to work because he was recovering from surgery on the hand he broke when he punched the refrigerator. When asked, "[D]id DCS make you punch that fridge?", he admitted, "No." He further admitted that he lost his previous job at Denny's not because of DCS, but because he "didn't get along" with the manager.

¶41        The juvenile court issued its ruling in February 2025 terminating the parental rights of both Father and Mother. The court acknowledged that Mother had remedied concerns about her mental health, and that "domestic violence does *not* appear to present" a continuing "barrier to reunification." The court further found, however, that the parents had not remedied other barriers to reunification, including Father's anger issues, their unsafe parenting practices, and their financial instability. The court determined statutory grounds for termination under

A.R.S. § 8-533(B)(8)(c) — 15 months' out-of-home placement — was established and that the termination was in the children's best interests.

**¶42**      Both parents timely appealed. We have jurisdiction pursuant to A.R.S. §§ 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

**¶43**      While parents have a fundamental right to the custody and control of their children, that right is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). The parental relationship may be terminated if the juvenile court finds, by clear and convincing evidence, at least one statutory ground for termination under A.R.S. § 8-533(B) and further finds, by a preponderance of the evidence, that termination is in the child's best interests. *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474, ¶ 13 (2022) (citations omitted). When reviewing an order terminating parental rights, we view evidence in the light most favorable to sustaining the juvenile court's findings. *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008) (citation omitted). We will affirm a termination order absent an abuse of discretion. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

**¶44**      Both Mother and Father submitted opening briefs in this case. However, Mother's "brief" is a short, handwritten letter asserting that she "deserve[s] a second chance" because she has been "keeping up with [her] medications" and "taking classes to better [her]self."

**¶45**      "Opening briefs must present significant arguments, supported by authority, setting forth the appellant's position on the issues raised[,]" otherwise the issues are waived. *MacMillan v. Schwartz*, 226 Ariz. 584, 591, ¶ 33 (App. 2011) (citation omitted). Mother's brief simply fails to develop any issue adequately for us to review. We therefore consider her arguments waived and proceed to the issues raised in Father's brief.

**¶46**      To terminate parental rights on 15-months' out-of-home placement grounds, A.R.S. § 8-533(B)(8)(c) requires the court to find that (1) the child has been in "an out-of-home placement for a cumulative total period of fifteen months or longer," (2) DCS "made a diligent effort to provide appropriate reunification services," (3) the parent has been "unable to remedy the circumstances that cause the child to be in an out-of-home placement," and (4) there is a "substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). In its ruling, the court found that counsel for the children had established all four prongs. Father challenges

the court's findings on only the last two prongs, *i.e.*, that the parents were unable to remedy the circumstances that caused the children's out-of-home placement and that there was a substantial likelihood that they would not be capable of exercising proper and effective parental care and control in the near future. *Id.* We therefore affirm, as unchallenged, the court's findings that C.B. and L.B. were in an out-of-home placement for longer than fifteen months and that DCS made a diligent effort to provide appropriate reunification services. *See Crystal E. v. Ariz. Dep't of Econ. Sec.*, 241 Ariz. 576, 577-78, ¶ 5 (App. 2017) (affirming juvenile court's unchallenged findings of grounds for termination under A.R.S. § 8-533(B)(8)(c)).

¶47 The court also found that termination would be in the children's best interests. Father does not challenge this finding, which we also affirm. *See id.*

**A. The juvenile court did not abuse its discretion in finding that the parents were unable to remedy circumstances that caused the children's out-of-home placement.**

¶48 In finding that the parents had not remedied the circumstances that led to the children's out-of-home placement, the court identified three circumstances that "continue[d] to present barriers to reunification." First, the court found, Father's "emotional instability and anger presents a safety risk to the children." The court found, second, that both parents have struggled to follow "basic safe parenting practices," and, third, that the parents have been unable to maintain stable housing and employment. Challenging these findings, Father maintains the court failed to cite specific evidence to support them and failed to give sufficient weight to evidence of "how much progress" he made during the dependency.

¶49 A review of the record shows that abundant evidence supports the juvenile court's findings. As the court pointed out, several incidents in 2024 alone showed Father had not overcome his anger management issues. Twice in mid-2024, Father was directed to move out of the place where he was residing; both times, he reacted with physical violence. Father broke his own hand punching a refrigerator, an injury that required surgery and resulted in the loss of his job when he was unable to work while recuperating. Father later threatened violence after the case plan was changed to severance and adoption. These incidents, which occurred only months before trial began, support the court's finding regarding Father's lack of sufficient progress in addressing his anger issues.

**¶50**　　　　The court acknowledged that Roskens opined Father had made progress in avoiding dysregulation in times of stress. The court gave limited weight to this testimony, however, because the court doubted that Father's improved ability to keep calm during "supervised" visitation sessions "in a highly controlled . . . environment" established that he would be similarly able to avoid dysregulation when engaged in "the daily task of parenting two young children." As the court noted, participating in weekly four-hour "coaching sessions" is "not the same as 24/7 parenting." While Father evidently believes that the court accorded insufficient weight to Roskens's testimony about Father's progress in controlling his anger, it is not for this court to re-weigh the evidence. *Mary Lou C.*, 207 Ariz. at 47, ¶ 8 ("[T]his court will not reweigh the evidence but will look only to determine if there is evidence to sustain the court's ruling." (citation omitted)).

**¶51**　　　　The court's findings about Father's inability to follow safe parenting practices are supported by evidence that a parenting coach observed Father "holding [C.B.] a little tightly" when she resisted going down for her nap, and by evidence that Father was so rough with L.B. during a diaper change that the child required medical treatment.

**¶52**　　　　The court's findings about the parents' ongoing financial instability are supported by evidence that their housing arrangements changed multiple times over the course of the dependency proceedings. In 2024 alone, Father and Mother lived at a Budget Suites, then in a trailer owned by the maternal grandfather, then in a trailer with J.L. After they were evicted from the second trailer, Mother returned to live with her father, but Father was not allowed to join her. Further, the parents did not demonstrate an ability to pay their monthly living expenses. The maternal grandfather paid for their stay at the Budget Suites. Later, the parents paid rent to the maternal grandfather for only two of the six or seven months they lived in his trailer, and, as J.L. testified, they paid no rent at all after moving in with him. Father's employment was similarly unstable; he admitted that he obtained and lost multiple jobs over the course of the dependency.

**¶53**　　　　Father argues that the juvenile court's findings of the parents' employment and housing instability ignored their "actual circumstances at the time of trial." At the time of trial, Father asserts, the parents "had been in an apartment for a month with no plans to leave," and he had one job and "would be starting [another] soon."

**¶54**　　　　In view of Father's frequent changes of residence, his testimony that he moved into a new apartment a week or two earlier, even accepted as true, hardly demonstrates housing stability. And although

Father testified at trial that he was currently employed part-time at a pizza restaurant and expected to start a second part-time job cleaning airplanes at the airport, he admitted he had not yet passed the background check needed to begin the second job. Moreover, he testified that he did not intend to keep both jobs; if the children were returned to his care, he said, he would have to quit one of the jobs to be available to care for them. Father's testimony did not, in other words, establish that he had achieved financial stability through steady, full-time employment.

¶55        Father's persistent violent outbursts, his unsafe parenting behaviors, and his ongoing failure to demonstrate an ability to maintain stable housing and steady employment constitutes sufficient evidence to support the juvenile court's finding that he did not remedy the concerns that led to the children's out-of-home placement.

> **B.        The juvenile court did not abuse its discretion in finding a substantial likelihood that the parents would not be capable of exercising proper and effective parental care and control in the near future.**

¶56        Father also argues that the juvenile court did not make the required findings about his likelihood of being able to parent in the near future, but merely "rehashed" its already-stated concerns about his past behavior without "acknowledg[ing]" the positive progress he made.

¶57        A review of the juvenile court's lengthy and detailed ruling shows that the court gave careful consideration not only to the circumstances giving rise to the dependency, but to whether Father would be able to remedy them in the near future. The court acknowledged that the parents had "made some progress," but found their progress too little and too slow in view of the 3½-year duration of the dependency, which encompassed all of L.B.'s life and all but two months of C.B.'s. Such a finding is consistent with that made by courts in similar circumstances. *See, e.g.*, *In re A.M.*, CA-JV 24-0043, 2025 WL 1079219 at *4, ¶ 25 (Ariz. App. Apr. 10, 2025) (mem. decision) (juvenile court's finding that the child "had been in an out-of-home placement since birth, a period of nearly three years," was a factor in support of termination on 15-months' ground); *Keilynn K. v. Dep't of Child Safety*, CA-JV 2015-0051, 2015 WL 5120703 at *6, ¶ 19 (Ariz. App. Aug. 31, 2015) (mem. decision) (evidence that mother took three years "to even make minimal progress" supported juvenile court's findings that Mother was unlikely to be able to parent in the near future).

¶58        The court further noted that the progress the parents made had been in "highly controlled and supervised" environments; the court

expressed doubt that the progress would continue if they resumed "24/7 parenting." As the court observed, parenting a baby and a toddler for a few hours a week in the presence of a parenting coach, with the option of taking five-minute breaks in moments of stress, is wholly unlike parenting them on a full-time basis without professional support. Further, Father's testimony at the termination trial — in which he blamed DCS for his recurring job losses and the maternal grandfather for the altercation in which Father broke his hand — demonstrates his continued refusal to accept responsibility for his own actions. As Dr. Mirkin opined, Father's "consistent denial of inappropriate actions" will "hamper[]" his ability to make "positive change" in the future. Dr. Mirkin's report supports the court's determination that a substantial likelihood existed that he would be unable to properly parent the children in the near future.

¶59        Father has failed to establish that the juvenile court abused its discretion in determining that the limited positive behavioral changes that he made over the course of 3½ years were insufficient to justify denying permanency to C.B. and L.B. *See Jacklyn D. v. Dep't of Child Safety*, CA-JV 18-0156, 2018 WL 6615155 at *3, ¶ 18 (Ariz. App. Dec. 18, 2018) (mem. decision) (finding that Mother's "lack of progress" over three-and-a-half-year dependency supported juvenile court's finding that Mother was unlikely to be able to parent in the near future); *cf. Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 287, ¶ 17 (App. 2016) ("[C]hildren should not be forced to wait for their parent to grow up." (citation omitted)). The juvenile court did not abuse its discretion in finding grounds for termination.

## CONCLUSION

¶60        We affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:            JR